SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW
222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
CARRIE I. DAYTON
KEVIN A. GUERKE

(302) 888-0600
FAX: (302) 888-0606

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

February 4, 2004

***Via Federal Express***
S. Mark Lindsey, Esquire
Federal Railroad Administration
Office of Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20005

**RE: Gordon and Finger v. DeLeuw, Cather, Parsons, et al.**
**Civil Action No.:**

Dear Mr. Lindsey:

The above claim stems from Northeast Corridor Improvement Project construction occurring at Amtrak's Wilmington, Delaware yard in 1986 and 1987.

Briefly, in 1986, DeLeuw Cather Parsons ("DCP") under a contract with the Federal Railroad Administration ("FRA") served as engineer for a project at Amtrak's Wilmington yard for the construction of a facility known as the Wheel Shop. During the course of the construction, excess excavated soil was removed from the Amtrak facility and deposited on land owned by Louis Finger, Arthur Krieger and others who are plaintiffs in this proceeding. The soil was later determined to contain low levels of PCB contamination. Plaintiffs filed suit against Amtrak, DCP and others involved in the construction seeking remediation of the PCB contaminated soil and damages for economic loss. The Court bifurcated the trial. The liability phase resulted in judgments against Defendants Amtrak and DCP based upon negligence.[1] A copy of the opinion is enclosed. (Exhibit 1) Trial on the damage phase is scheduled to begin in March. In the interim, the parties have agreed to mediation.

[1] A contractor was also found liable, but that company is no longer operating and has no assets.

Plaintiffs are divided into two groups. The first is the Estate of Arthur Krieger which no longer holds legal title to the property but claims damages for economic loss sustained during its ownership. (For your review, I am enclosing a copy of the Estate's expert reports (Exhibit 2) outlining its claims for economic losses). The second is Louis Finger and his relatives claiming economic loss and also seeking a complete remediation of the site including the removal of PCB contaminated soil to an approved EPA facility.

Amtrak and DCP plan a joint defense in the damages phase and will contend that the complete remediation of the PCB contaminated soil, which could cost $4 to $5 million dollars, is not justified given the nature of this property. We hope to prove there are other contaminates found on these properties not originating from the Amtrak site. We will argue we have no responsibility to remediate these other contaminates. In addition, the fair market value of these properties do not justify a complete remediation. We instead contend that the PCB contaminated soil should be covered at a cost of between $500,000 and $1,000,000.

Given the circumstances, I believe it unlikely that the Court would impose a complete remediation. I believe there is less than a 20% possibility that the Court would order such a remedy. The most likely result is an award of damages for economic loss and an environmental capping.

Also, shortly after the liability phase of the trial, the local environmental authorities, Department of Natural Resources and Environmental Control ("DNREC") studied this site and identified Amtrak and the current owners/plaintiffs as potentially responsible parties ("PRPs"). Thereafter, Amtrak entered into a voluntary cleanup plan with DNREC for this site and is currently conducting a remedial investigation and feasibility study for this site. To date, Amtrak has spent in excess of six hundred thousand dollars in that plan. Although DCP was not identified as a PRP, it certainly is exposed to Amtrak for a contribution claim for the monies spent on that study.

Together with Amtrak, we have developed a settlement plan. We hope to able to enter into a settlement agreement with the plaintiffs at a cost not to exceed $400,000. As noted above, the Krieger plaintiffs have transferred their property to the Riverfront Development Corporation, a quesi-governmental agency developing properties along the river. For that reason, the Estate no longer has interest in the cleanup. We estimate it would probably settle for something in the range of $200,000. We also believe the Finger plaintiffs would settle their claims for about $400,000. I am enclosing a

copy of the letter (Exhibit 3) I recently directed to DCP outlining our proposed settlement plan.

We are directing this letter to the FRA because we believe under the terms of its contract with DCP, the FRA is responsible for payments made to these parties. To date, DCP payments in lawsuits related to this NECIP/FRA project total $960,000, not including attorney's fees. When added to this total, the amounts exceed $1,000,000. As you know, the NECIP contract provides that the FRA will indemnify for DCP any claims arising over the $1,000,000 limit. A copy of that clause is enclosed. (Exhibit 4) In addition, Amtrak to date has spent in excess of $250,000 on this claim for attorney's fees and expert witness fees. For these reasons, we believe that it is clear that Amtrak has exceeded the $1,000,000 limit imposed by the FRA/DCP contract.

For that reason, we are requesting FRA authority to pay up to a total of $400,000 to settle the claims. We also request authority to move forward on this promptly. Our mediation was scheduled for February 9 but had to be continued because we believe that the FRA should approve in advance any offers made at the mediation in light of the indemnification provisions. As stated above, our trial is scheduled to resume in March and for that reason, we would like to know in the next week to 10 days, what the FRA's position is on making these offers.

Very truly yours,

George H. Seitz, III

GHS:drc
Enclosures

cc: Richard L. Reddy, Esquire



39036 v1

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
~~POST OFFICE BOX 68~~
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
CARRIE I. DAYTON
KEVIN A. GUERKE

(302) 888-0600
FAX: (302) 888-0606

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

February 17, 2004

***Via Facsimile and***
***Regular Mail***
Gareth W. Rosenau, Esquire
Office of the Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20590

**RE: Gordon, et al. v. DCP, et al.**

Dear Mr. Rosenau:

This will follow up our telephone conversation today when you requested evidence of notice of this claim to the FRA. Enclosed is a letter dated May 12, 1989 from DeLeuw Cather's in-house counsel Jim Lockwood to me assigning the case, discussing the fact that a claim had been filed and making comments on the allegations that had been made in the complaint. This letter was copied to R. Krempasky at the FRA.

Although there could have been some earlier notice to the FRA, this is the earliest notice to the FRA contained in my files.

Respectfully submitted,

George H. Seitz, III

GHS:drc
Enclosure
cc: Richard L. Reddy, Esquire (w/enclosure) (via facsimile)

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW
222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

November 1, 2004

***Via Facsimile and***
***<u>First Class Mail</u>***
S. Mark Lindsey, Esquire
Federal Railroad Administration
Office of Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20005

**RE: Gordon and Finger v. DeLeuw, Cather, Parsons, et al.**
**Civil Action No.:**

Dear Mr. Lindsey:

This is to follow up my letter to the FRA dated February 4, 2004 (attached) explaining the nature of this claim and requesting authority for $400,000 to settle these claims. Since that time, the FRA has denied responsibility and did not participate in settlement negotiations. Further, as I advised you in my letter dated March 22, 2004 (attached), in the interim, we have negotiated a settlement with the Krieger plaintiffs and are still attempting to negotiate settlement with the Finger plaintiffs. We estimate that our ultimate contribution to that settlement would be in the range of $200,000. Again, we invite FRA to participate in these settlement negotiations since ultimately DeLeuw Cather Parsons (DCP) would be looking to FRA to reimburse it for all these expenditures exceeding the $1,000,000 indemnification limit under the FRA/DCP Contract.

DCP is assembling the figures for the amounts paid in settlement of these claims made under the FRA Contract and will ultimately be presenting its claim for reimbursement to the FRA.

Very truly yours,

George H. Seitz, III

GHS:drc
Enclosures
cc: Richard L. Reddy, Esquire (w/encl.)(via facsimile)
Gareth Rosenau, Esquire (w/encl.)(via facsimile)

44630 v1

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
CARRIE I. DAYTON
KEVIN A. GUERKE

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

March 22, 2004

***Via Facsimile***
S. Mark Lindsey, Esquire
Office of the Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20590

**RE: Gordon, et al. v. DCP, et al.**

Dear Mr. Lindsey:

This responds to your letter dated March 10 received on March 15. DeLeuw Cather Parsons ("DCP") recently wrote the FRA because it realized the total payments it would make for these Northeast Corridor Improvement Project claims would likely exceed the million dollar limit under the indemnification provision of its FRA contract. For that reason, it notified the FRA of the mediation. The FRA chose not to participate.

Regarding the notice issue, the letter, copied to the FRA's legal department, giving notice of the lawsuit certainly is sufficient under the contract. Also, DCP may have additional correspondence in its files giving notice to the FRA. As you know, these records go back some time and DCP is reviewing its files to determine what other notices to the FRA exist.

Please be advised that we have reached tentative settlement with the Krieger plaintiffs and are negotiating an additional settlement with the Finger plaintiffs. In light of the position taken of your March 10th letter, DCP understands that the FRA does not wish to participate in any of the settlement negotiations. DCP intends to reach a settlement with the remaining plaintiffs on the best terms available. Finally, irrespective of the position stated in your March 10th letter, DCP intends to pursue its claims for indemnification.

Very truly yours,

George H. Seitz, III

GHS:drc
cc: Richard L. Reddy, Esquire (via facsimile)



40464 v1

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

(302) 888-0600
FAX: (302) 888-0606

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

February 24, 2005

***Via Facsimile and***
***<u>First Class Mail</u>***
S. Mark Lindsey, Esquire
Federal Railroad Administration
Office of Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20005

**RE: DCP v. FRA Claim for Indemnification under Northeast Corridor Improvement Projects**

Dear Mr. Lindsey:

This letter is to supplement my previous correspondence to you concerning DeLeuw Cather Parsons' ("DCP") request for indemnification for losses sustained as a result of work performed on the Northeast Corridor Improvement Projects pursuant to Section 14 of the FRA/DCP contract.

The following is a list of the claims filed in the losses sustained to date.

- **<u>Gordon, et al. v. DeLeuw Cather Parsons, et al.</u>** - This is a claim for losses sustained when soil allegedly containing PCB contamination from an Amtrak facility was moved to the plaintiff's property. I previously summarized these claims to you in my letter dated February 4, 2004. As you know, DCP has already paid $190,000 in settlement in claims with the Krieger plaintiffs. The claims of remaining plaintiffs are pending trial. Plaintiffs seek to impose upon defendants an obligation to remove all PCB contaminated soil from this site. If plaintiff is successful in these claims, the cleanup cost could well be within the range of $5 million dollars. Although I do not believe the Court would entertain such a remedy, such a remedy is possible. DCP will look to FRA for indemnification under the contract.



46610 v1

- **A&C Ship Fueling v. Amtrak v. DCP** – This action was filed in the Southern District of New York, [Civil Action No. 86 Civ. 8364 (WK)]. Plaintiff claimed property damage stemming from faulty signal equipment. DCP contributed $20, 833.33 in settlement of this claim and also incurred attorney's fees.

- **Fulginiti v. DCP** – This is a claim filed in Delaware District Court arising from personal injuries sustained in a fall at the Amtrak station. DCP contributed $7,500.00 towards settlement of this claim and its attorney's fees and costs were in excess of $50,000.

- **Wilbur Smith Associates v. FRA** - This was a claim filed in arbitration alleging defects in the design review process of the Rail Station in Stamford, Connecticut. The arbitration resulted in an award of $377,636 to Wilbur Smith and Associates. DCP will seek reimbursement for all attorneys' fees incurred in its defense cost.

- **Massachusetts Bay Transportation Authority** – Various claims arising from contribution of NECIP facility in Massachusetts. A schedule of payments made in settlement is attached as Exhibit A.

In addition, legal and expert witness fees on these matters to date total $1,450,463. The FRA was on notice and/or participated in each of these claims. Under the terms of its contract, DCP believes it's entitled to full indemnity.

We would like to meet with you to discuss what documentation you will need to process this claim. We would like to know the FRA's present position on these claims.

Thank you.

Very truly yours,

George H. Seitz, III

GHS:drc
Enclosures
cc: Richard L. Reddy, Esquire (w/encl.)(via facsimile)
Gareth Rosenau, Esquire (w/encl.)(via facsimile)



46610 v1

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW
222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

May 5, 2005

S. Mark Lindsey, Esquire
Federal Railroad Administration
Office of Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20005

**RE: DCP v. FRA Claim for Indemnification under Northeast Corridor Improvement (NECIP) Projects**

Dear Mr. Lindsey:

This is in response to your March 22 letter refusing to acknowledge FRA's obligation to indemnify DCP for claims arising under the NECIP contract.

As I am sure you are aware, DCP's claims for indemnification rest on separate negotiation entered between DCP and the FRA in the late 1970s, after the original NECIP contract was executed. That negotiation resulted in the enclosed Memorandum Agreement (Exhibit 1) between the FRA and DCP providing for indemnification under PL85-804. This made it clear that DCP was not required to maintain malpractice insurance coverage for the NECIP projects. Thus, any claims falling under those coverages were intended to fall under the indemnification. We feel each of the claims we have presented fall under that coverage.

**A&C Ship Fueling Corporation and Eklof Marine Corp. v. National Railroad Passenger Corporation, et al.**

This was a claim brought by A&C Ship Building resulting from a damaging collision of the M/V John J Tabeling with the Penn Mainline Bridge. DCP was brought into this action as a fourth party defendant. Copies of the Complaint and the Fourth Party Complaint are attached. (Exhibit 2) This was obviously a claim against DCP's design work falling under the indemnification. Eventually the case was settled for a payment of $72,500.00. DCP paid $20,866.66. In addition, DCP retained Gadsby & Hannah to represent its interest in this matter. That firm's fees for both this and the Wilbur Smith matters are discussed below. DCP is not

making any claim for reimbursement of these sums. These payments do, however, represent a portion of the deductible required under the contract.

**Wilbur Smith Associates v. DeLeuw Cather Parsons Arbitration Proceedings**

As you know, Wilbur Smith Associates brought an arbitration proceeding against DCP arising from work on the design of the Stamford Transport Station Center in Stamford, Connecticut. Clearly such a claim falls within the intent of the indemnification. Copies of the relevant pleadings relating to that arbitration are enclosed. (Exhibit 3).

Ultimately Wilbur Smith received an award of $377,636 in July 1989. Copies of the papers relating to the confirmation of this award are enclosed for your review. (Exhibit 4) In addition to this award, DCP's legal fees associated with this matter and the A&C claims totaled $408,002.74. Again while these matters go back a number of years, these payments do not represent claims for reimbursement but rather payment toward the deductible. With the payment of the fees and expenses in the A&C and Wilbur Smith matters, DCP's payments were as follows:

| | |
|---|---|
| A&C | $ 20,866.66 |
| Wilbur Smith | $377,636.00 |
| Attorneys Fees | $408,002.74 |
| **TOTAL** | $806,505.40 |

Even if we do not consider the MBTA claims, DCP has paid over $800,000 for NECIP claims. Please note these amounts are presented to satisfy the deductible, and we believe for that reason the time bar issues do not apply.

In addition, in your March 22 letter, you question whether DCP complied with the notice requirements under the contract to offer the FRA the opportunity to defend these cases. The FRA was clearly aware of these proceedings. The file reflects communications (Exhibit 5) between the FRA and DCP on the Wilbur Smith arbitration proceedings and related proceedings in the federal court. DCP's practice was to notify FRA at the outset of any litigation. (Exhibit 6) FRA could have chose to defend these proceedings at any time and elected not to do so. We believe that the Contracting Officer was given notice in each of these claims.

**Gordon v. Amtrak and DeLeuw Cather**

As you know, this action involves the deposit of allegedly contaminated soils from the Amtrak yard on several parcels by Gordon/Finger plaintiffs and Krieger plaintiffs. DCP was found liable and such claims were based on its negligent supervision, again clearly falling under the provisions of the indemnification. To date, DCP's fees and expenses for this case have totaled $379,998.09. In addition, it has paid the Krieger plaintiffs $190,000 in settlement. The

claims of the other plaintiffs are still pending. We are awaiting a hearing on damages before the Court. We have invited you to participate in these proceedings and you have not done so.

Based on these figures, DCP has paid to date $1,368,500 in NECIP claims and is entitled to a reimbursement of $368,500 with interest.

**MBTA Claims**

This above amount does not reflect the MBTA claims arising out of the construction of the South Station in Boston, Massachusetts. As you know, DCP contributed $425,000 to the settlement of this claim. Its attorney's fees totaled $553,943.43. This represents an additional $978,943.43 DCP is entitled to seek under the indemnification provisions. We assume there is no question of proper notice on these claims. You do, however, contend they are barred by the reciprocal release. The Settlement Agreement and Release are attached as Exhibit 7. We do not believe an executed release by third parties releases the FRA from indemnification. Further, the FRA release appears only to run to DCP and is not reciprocal. For that reason, the full amount of those payments also falls under the indemnity.

For all these reasons, we are renewing our demand for indemnification of on the NECIP claims. We would welcome an opportunity to resolve these issues amicably. If that opportunity is not available, we will be forced to file a formal claim.

Very truly yours,

George H. Seitz, III

GHS:drc
Enclosures

cc: Richard L. Reddy, Esquire (w/o encl.)(via facsimile)

U.S. Department of Transportation
Federal Railroad Administration
1120 Vermont Ave., N.W.
Washington, D.C. 20590

April 13, 2006

APR 24 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

George H. Seitz, III
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue–Suite 1500
Wilmington, DE 19899

Re: Parsons Transportation Group's Claim for Indemnification Under Public Contract Number DOT-FR-76048

Dear Mr. Seitz:

The following information concerns the above-referenced claim, dated November 8, 2005, my letter to you of December 1, 2005, and your subsequent discussions with the Office of Chief Counsel concerning the correct procedure for filing a request for an equitable adjustment.

As previously stated, your claim for indemnification, which is filed pursuant to Public Law 85-804 (the "Act"), is not cognizable under the Contract Disputes Act. See FAR 33.205(a). Rather, such a claim must be processed pursuant to FAR Part 50 as an equitable adjustment.

Pursuant to FAR Part 50, any request for an equitable adjustment on behalf of Parsons Transportation Group, Inc. ("Parsons") should include the following information.

(1) Identify the contract pursuant to which indemnification is requested.

(2) Identify the specific clauses in the contract upon which Parsons relies in making its request for an equitable adjustment.

(3) Attach all relevant documentation demonstrating that Parsons has fully complied with the applicable clauses in the contract upon which it relies in making its request for an equitable adjustment, including applicable references in the body of the request.

(4) For each sub-claim presented, identify the precise adjustment requested (a sum certain), and include a complete explanation of the essential facts, summarized chronologically, in narrative form that supports the equitable adjustment. Include supporting documentation, with appropriate references in the body of the request. The sub-claims should be aggregated at the end to a grand total (a sum certain) for the entire request. In the event a sum certain for a sub-claim cannot be determined because of on-going litigation, it should nevertheless be presented and an explanation

made as to why no amount can be currently requested for it. (Do not claim an estimated amount; although, an estimated amount may be discussed in a cover letter.) The request for an equitable adjustment may be later amended to include a sum certain for such a sub-claim. This agency may act on the remaining portions of the request for an equitable adjustment which have been reduced to sums certain.

(5) For each sub-claim presented, state the precise conclusions based upon the facts set forth in (4) upon which Parsons relies in considering itself entitled to an adjustment. Reference to specific contract clauses set forth in (2) is essential. The conclusions should adequately demonstrate that sub-claims presented fall within the coverage of the indemnification contemplated by the contract.

(6) For each sub-claim presented, state whether or not: (a) all obligations under the contract have been discharged; (b) final payment under the contract has been made; (c) any proceeds from the request will be subject to assignment or other transfer, and to whom; and (d) the contractor has sought the same, or similar or related, adjustment from the General Accounting Office or from any other part of the Government, or anticipates doing so.

(7) For each sub-claim presented involving settlement in litigation or judgment rendered by a court or through other judicial process, state the precise amount paid by Parsons and to whom and the date on which: (a) a settlement agreement has been executed or a judgment rendered, and (b) payment has been made by Parsons to the other party or parties.

(8) For each sub-claim presented involving litigation for which Parsons was a defendant, state the date on which the complaint was filed and include a chronological description of the procedural history of the case. In the event the contracting officer of FRA was notified in writing and the agency given an opportunity to defend the action, include copies of such relevant documentation and include in the request the date of any such notice. Response(s) from the agency to any such notice should be included. All such documents should include appropriate references in the body of the request.

(9) The request for an equitable adjustment must include the following information with respect to insurance coverage: (a) names of insurance companies, policy numbers, and expiration dates (including copies thereof); (b) a description of the types of insurance provided (including the extent to which Parsons is self-insured or intends to self-insure), with emphasis on identifying the risks insured against and the coverage extended to persons or property, or both; (c) dollar limits per occurrence and annually, and any other limitations, for relevant segments of the total insurance coverage; (d) deductibles, if any, applicable to losses under the policies; (e) any exclusions from coverage under such policies for unusually hazardous or nuclear risks or for specific projects; (f) applicable workers' compensation insurance coverage; (g) whether Parsons' insurance program was approved or accepted by FRA or any other U. S. Government agency; and (h) if Parsons is a division or subsidiary of a parent corporation (or was at relevant times giving rise to the request), a statement of any insurance coverage of the parent corporation that bears

upon the risks for which Parsons seeks indemnification, and a description of the precise legal relationship between parent and subsidiary or division.

(10) If Parsons is in possession of documentation authorizing the exercise of indemnification pursuant to the Act, it should be presented with the request for an equitable adjustment.

(11) The request for an equitable adjustment must include a certification by a person authorized to certify the request on behalf of Parsons that: (a) the request is made in good faith; and (b) the supporting data and documentation are accurate and complete to the best of that person's knowledge and belief.

Please note that requests for an equitable adjustment must comply with applicable statutes of limitations and relevant legal authority.

Pursuant to FAR Part 50, this agency may request supplemental information deemed necessary to process a request for an equitable adjustment.

If you have questions concerning the equitable adjustment process, please let me know or call Gareth Rosenau at 202-493-6054.

Sincerely,

Illona M. Williams

Illona M. Williams
Director
Office of Acquisition and Grants Services

cc: S. Mark Lindsey, Chief Counsel
Gareth Rosenau, Senior Attorney

PARSONS

1133 Fifteenth Street, NW . Washington, DC 20005-2701 . (202) 775-3300 . Fax (202) 775-3422 . www.parsons.com

OCT 26 2006

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

October 10, 2006

Illona M. Williams, Director
Acquisitions & Grant Services
Office of Acquisitions and Grant Services, Stop 50
Federal Railroad Administration
Department of Transportation
1120 Vermont Avenue, N.W.
Washington, D.C. 20590

RE: Parsons Transportation Group's Request for Indemnification
Under Public Contract Number DOT-FR-76048

Dear Ms. Williams:

Parsons Transportation Group, Inc. ("Parsons"), as successor to the interest of DeLeuw Cather/Parsons Joint Venture ("DCP"), pursuant of Part 50 of the Federal Acquisition Regulations(FAR), Subpart 50.403.1, hereby requests reimbursement for expenses incurred under the indemnification provision in the above referenced contract. For the reasons set forth below, Parsons seeks an adjustment of $1,400,497.92 together with interest, costs and attorneys fees under the indemnification provisions of Article XIV, as modified by the May 31, 1979, Memorandum of Negotiation, attached hereto as Exhibit "A".

On October 25, 1979, the Federal Railroad Administration ("FRA") awarded contract number DOT-FR-76048 (the "Contract") to DCP to provide services as prime architect-engineer and program manager for the Northeast Corridor Improvement Project ("NECIP"), a program

undertaken by FRA pursuant to Title 7 of the Railroad Revitalization and Regulatory Reform Act of 1976. There were several inherent risks in the Contract that DCP, as the architect and project manager, bore. These risks included the implied warranty to the construction contractors that its designs were adequate, complete, and constructible. DCP also bore the risk of any injuries caused by mistakes of its employees and Independent Contractors. Furthermore, as the project manager DCP controlled site access; ensured compliance with permitting, and other property use regulations and requirements; and, coordinating the activities of multiple subcontractors and contractors some of whom were its subcontractors, another contractor selected by FRA, or a subcontractor of another contractor selected by FRA or DCP's subcontractors. *See* Exhibit B, Contract, Scope of Services, Exhibit 1, Tasks 403-407. Under normal circumstances the myriad of risks associated with these activities would be covered by professional errors and omissions insurance. However, this was not the case in this instance. Under the Contract, the FRA agreed to indemnify DCP under P.L. 85-804 pursuant to authority granted FRA in the fiscal year 1979 DOT Appropriations Act.

The Contract provided the FRA would hold DCP harmless from:

> (i) claims (including reasonable expenses of litigation or settlement) by third persons (including employees of the A-E Contractor) for death, personal injury, or loss of, damage to, or loss of use of property;
>
> . . .
>
> (c) is in excess of the first $1,000,000 in the aggregate of all such claims, loss, or damage, which aggregate amount of claims, loss, or damage shall be borne by the A-E Contractor. Any such claim, loss or damage within deductible amounts of A-E Contractor's insurance required to be maintained pursuant to this contract shall not be covered under this clause.

The Contract also provided that all risks related to the NECIP are defined to be "unusually hazardous or nuclear in nature." Exhibit C, Contract, Article XIV, ¶14.06. Under P.L. 85-804 this provision is tied to unusually hazardous activities thus triggering the provision of FAR Part 50. The indemnification was given in consideration for the fact that DCP was not required to maintain professional errors and omissions insurance coverage for the NECI.P These provisions were designed to protect DCP from claims that would otherwise be covered by malpractice insurance and DCP. *See* Exhibit A.

Though DCP was not required to carry professional errors and omissions insurance they were required to have comprehensive general liability insurance. Under a general liability insurance policy, the insurer is obligated to pay the legal costs of a business in a covered liability claim or lawsuit. Covered liability claims include bodily injury, property damage, personal injury and advertising injury (damage from slander or false advertising), but not damages caused by negligence or inadequacy in the performance of these professional services. In comparison, professional errors and omissions insurance covers claims of alleged financial loss caused by negligence or inadequacy in the performance of these professional services. Such losses are not covered by a general liability policy, which typically covers only bodily injury and property damage losses not caused by negligent acts, errors or omissions, which are attributed to the performance of a professional service. Since the amounts sought in this adjustment would have been provided by professional errors and omissions insurance, which was not purchased at a savings to the government, and not general liability insurance, FRA under the terms of the Contract must reimburse Parsons for the damages sustained in the four projects discussed below.

For this reason, we do not have any applicable insurance information to provide you in response to your letter (item 9) dated April 13, 2006.

In further response to your April 13 letter, each sub-claim for which DCP seeks indemnification is set forth below.

Gordon-Finger Claims

DCP provided architectural/engineering services in the 1980's for improvements at Amtrak's Wilmington, Delaware rail yard, including the design and construction of a building known as the Wheel Shop. During construction, excavated material, allegedly containing PCB contaminated soil, was removed from the rail yard and deposited on parcels owned by the Arthur J. Krieger (deceased) ("Krieger"), jointly by Bernard M. Gordon and Louis J. Finger ("Gordon-Finger Plaintiffs") and jointly by Krieger and Finger. On May 17, 1989, the Krieger and the Gordon-Finger Plaintiffs filed an action in the Chancery Court of the State of Delaware, C.A. No. 10753 against DCP and others seeking damages and remediation of this alleged contamination. (Exhibit D)

DCP, as was its customary practice, sent FRA notice of this claim. (Exhibit E) Ultimately this case was tried on liability only. On April 2, 2002, DCP and Amtrak were found liable. (Exhibit F) The docket entries outlining the complete history of this action thus far are attached as Exhibit G. While the claims of the Gordon-Finger Plaintiffs remain unresolved and are pending a hearing on the damages, DCP entered into settlement discussion with the other plaintiffs. A settlement was reached on the other claims. On May 21, 2004, DCP paid the Estate

of Arthur Krieger $190,000 in settlement of its claims. A copy of that Settlement Agreement is attached as Exhibit H. Parsons therefore seeks, pursuant to the above referenced contract's indemnification clause, an adjustment in the amount of $190,000. As of the date of the Krieger settlement, DCP attorneys fees and expenses totaled $425,082.42. (Exhibit I). Parson seeks a reimbursement of $615,082.42 for these claims.

At this time, the claims of Gordon-Finger Plaintiffs have not been resolved. Parsons herby requests FRA's participation in ongoing settlement negotiations, which are discussed below.

Wilbur Smith Associates Claims

In the mid-1980s, DCP provided, under the Contract, architectural/engineering services for the design and construction of the Stamford Transportation Center in Stamford, Connecticut. During construction numerous design defects were encountered. A subcontractor/architect, Wilbur Smith Associates ("WSA"), performed extra design work to address the structural weaknesses caused by the design defects. On October 27, 1986, WSA requested $1,210,845 from DCP for the extra work on the structural elements of the Stamford Transportation Center. Like the Gordon-Finger claims, discussed above, the FRA also was on notice of the WSA Claims. (Exhibit J) WSA submitted its claims to an arbitration panel which ruled against DCP in the amount of $377,636 plus interests and attorneys fees. Relevant documents from these proceedings outlining the history of this action are attached as Exhibit K. Parsons seeks

reimbursement in the amount of $377,636 for the WSA claim, plus the attorney fees, paid to the firm Gadsby & Hannah, P.A, in this matter which are discussed below. (See Exhibit L)

A&C Fuel Claims

On April 18, 1985, a vessel owned by the A&C Fuel Corporation collided with the Penn Mainline Bridge operated by Amtrak and designed by DCP under the Contract. On October 31, 1986, A&C sued Amtrak to recover damages to its vessel in the collision. (Exhibit M) DCP was brought in to this action as a fourth party defendant. (Exhibit M). The docket entries outlining the complete history of this action are attached as Exhibit N. A&C claimed that DCP was aware of negligent design work of its subcontractor, Ammann & Whitney, on the temporary operating system and failed to act to correct this known defect, which was a contributing factor in the collision. As was its customary practice, DCP put FRA on notice of this claim. (Exhibit O) The action eventually settled, with DCP making a payment of $20,833.33. (Exhibit P ) The action was dismissed on December 22, 1989. (Exhibit Q)

As addressed above, DCP was represented by Gadsby & Hannah, P.A. for the WSA, and the firm also represented DCP on the A&C claim. The firm billed DCP for legal fees in the amount of $408,002.74 for services performed on these claims. (Exhibits R) The firm did not separately itemize service for these matters so Parsons is not able to itemize the legal fees. It is apparent, however, that most of these fees represent work on the WSA matter. Parsons seeks reimbursement in the amount of $20,833.33 for the A&C claim, plus the attorney fees,. for both the A&C and WSA claims, in the amount of $408,002.74.

Massachusetts Bay Transportation Authority Claims

Under the Contract, DCP also performed architectural engineering services for renovations and improvements to the South Station and associated structures, platforms, track and rail yards in Boston, Massachusetts ("South Station Project") in coordination with the Massachusetts Bay Transportation Authority ("MBTA"). On April 25, 1988, the MBTA sued DCP in the Commonwealth of Massachusetts seeking damages resulting from delay claims brought by JF White Construction Company ("White"), the project's general contractor. The FRA also participated in the resolution of these claims. (Exhibit S) The docket entries outlining the complete history of this case is attached as Exhibit T. The Complaint, First Amended Complaint and Second Amended Complaint outlining the claims asserted in this action are attached as Exhibit U. The Memorandum of Decision and Order dated November 29, 1994 granted partial summary judgment to MBTA is attached is Exhibit V.

On or about March 15, 1995, DCP made a payment of $425,000 to settle such claims. (Exhibit T) In addition, DCP paid attorneys fees and expense in excess of $553,943.43 associated with the South Station project. (Exhibit W) Thus, DCP's total losses for the MBTA claim were $978,943.43.

While Parsons is aware that it is FRA's position that the MBTA claims are barred by a reciprocal release, it disagrees with this position. (Exhibit X). As stated in our May 5, 2005, letter it is Parsons' position that this third party release does not relieve FRA from indemnification and the release is not reciprocal as it only runs to DCP. Consequently, Parsons seeks reimbursement in the amount of $425,000 for the MBTA claim, plus the attorney fees, in the amount of $553,943.43.

Unresolved Gordon Finger Claims

As discussed above, the liability phase of this claim was tried before a Master of the Chancery Court in Delaware. The findings of the Master indicate that DCP and Amtrak were liable in negligence. The amounts of the damages have not yet been determined, although the DCP has entered into a settlement with some of the plaintiffs in this case. Parson's herby provides notice to FRA that once this claim has been resolved, it will seek reimbursement of the attorney fees incurred in defending itself in this action as well as any damages paid to the Gordon-Finger Plaintiffs.

At this time, this case is pending review by the Delaware Department of Natural Resources and Environmental Control ("DNREC"). Based upon DNREC's recommendations concerning the environmental status of the property, it is not clear that the parties will be able to enter into a settlement and, accordingly, it appears that the case may proceed to trial before a special Master. As is discussed in more detail in Parsons' February 4, 2004, letter, we are hopeful that this case could proceed to a settlement in the range of $200,000 or $300,000 but considering the environmental liability in this matter, we believe there is an exposure of perhaps $4 or $5 million dollars if the court ordered a complete cleanup of all of the property. In addition, Amtrak has spent substantial sum of money in conducting a remedial investigation of the site. It has cross claims pending against DCP seeking to recover from DCP the amounts spent on this investigation. We believe the amounts spent on this investigation could exceed $200,000. As requested above, Parsons seeks FRA's participation in the ongoing settlement negotiations with the Gordon-Finger plaintiffs. In addition, Parsons' attorney fees and costs incurred in this action since the Finger settlement in 2004, now total $30,845.66.

At this writing, Parsons certifies that DCP's losses under the contract, excluding those unresolved claims discussed above, now total $2,400,497.92. Under the deductible provision, Parsons is seeking a total reimbursement of $1,400,497.92 ($2,400,497.92 less deductible ($1,000,000)). In addition, Parson's requests you participation and assistance in the remaining unresolved claims under the Contract.

Respectfully Submitted,

James Rollings
Senior vice President

GHS:drc
Enclosures
cc: Richard L. Reddy, Esquire (w/o encl.)(via facsimile)

George H. Seitz, III (w/o encl.)(via facsimile)
Attorney for Parsons Transportation Group, Inc.

U.S. Department of Transportation

Federal Railroad Administration

1120 Vermont Ave., N.W.
Washington, D.C. 20590

JAN - 3 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

George H. Seitz, III, Esq.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue--Suite 1500
Wilmington, DE 19899

Re: Parsons Transportation Group's Request for Indemnification
Under Public Contract Number DOT-FR-76048

Dear Mr. Seitz:

The following information concerns the above-referenced request for indemnification filed by Parsons Transportation Group (Parsons), on October 10, 2006, in response to our instructions of April 13, 2006, for filing a claim for an equitable adjustment under FAR Part 50.

After so many months of waiting for your response, I am greatly disappointed that Parsons has failed to file a request for an equitable adjustment in accordance with the clear instructions laid out in my April 13, 2006, letter. Instead, Parsons has filed a reiteration of its previous claim for indemnification, fashioned as a request pursuant to FAR Part 50.403-1. That subpart is applicable to requests for the inclusion of an indemnification clause pursuant to Public Law 85-804 in contracts in the initial instance. In this case, the indemnification clause has already been included in the applicable contract, and is already in effect. At this time, Parsons should have filed a request for an equitable adjustment pursuant to the contract clause, as stated in my April 13, 2006, letter.

Parsons must clearly demonstrate its entitlement to an equitable adjustment through a certified claim providing all of the information requested in my April 13, 2006, letter. The documentation supporting the claim must address the specific requirements laid out in that letter, and the submission must be at the level of detail set forth in the instructions. Please carefully review my previous letter and provide a claim which is responsive to those specific requirements.

Please submit your claim for an equitable adjustment to me before February 28, 2007.

If you have questions concerning the equitable adjustment process, please let me know or call Gareth Rosenau at 202-493-6054.

Sincerely,

Illona M. Williams
Director
Office of Acquisition and Grants Services

cc: S. Mark Lindsey, Chief Counsel
Gareth Rosenau, Senior Attorney

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

(302) 888-0600
FAX: (302) 888-0606

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

March 20, 2007

Illona M. Williams, Director
Acquisitions & Grant Services
Office of Acquisitions and Grant Services, Stop 50
Federal Railroad Administration
Department of Transportation
1120 Vermont Avenue, N.W.
Washington, D.C. 20590

RE: Parsons Transportation Group's Request for Equitable Adjustment under the Indemnification Provision of Public Contract Number DOT-FR-76048

Dear Ms. Williams:

Parsons Transportation Group, Inc., as successor to the interest of DeLeuw Cather/Parsons Joint Venture ( herein after "Parsons"), submits this request for equitable adjustment ("REA") pursuant of Part 50 of the Federal Acquisition Regulations (FAR) requesting reimbursement for expenses incurred under the indemnification provisions in the above referenced contract. For the reasons set forth below, Parsons seeks an adjustment of $1,400,497.92 together with interest, costs and attorneys fees under the indemnification provisions of Article XIV of contract number DOT-FR-76048 (the "Contract"), Exhibit 1, between Parsons and the Federal Railroad Administration ("FRA"), as modified by the May 31, 1979, Memorandum of Negotiation, attached hereto as Exhibit 2.

As you requested in your January 3, 2007, letter and in subsequent telephone conversations, we have modified our prior submission to correspond with your April 13, 2006, letter. The headings utilized below refer to the numbered paragraphs in the April 13, 2006, letter.

**Identification of Contract (Item 1)**

On October 25, 1979, the Federal Railroad Administration ("FRA") awarded contract number DOT-FR-76048 to Parsons to provide services as prime architect-engineer and program manager for the Northeast Corridor Improvement Project ("NECIP"), a program undertaken by FRA pursuant to Title 7 of the Railroad Revitalization and Regulatory Reform Act of 1976.

**Specific Contract Clauses upon which this REA is based (Item 2)**

There were several inherent risks in the Contract that Parsons, as the architect and project manager, bore. These risks included the implied warranty to the construction contractors that its designs were adequate, complete, and constructible. Parsons also bore the risk of any injuries caused by mistakes of its employees and Independent Contractors. Furthermore, as the project manager Parsons controlled site access; ensured compliance with permitting, and other property use regulations and requirements; and, coordinated the activities of multiple subcontractors and contractors some of whom were its subcontractors, another contractor selected by FRA, or a subcontractor of another contractor selected by FRA or Parsons' subcontractors. *See* Exhibit 3, Contract, Scope of Services, Contract Exhibit 1, Tasks 403-407. Under normal circumstances the myriad of risks associated with these activities would be covered by professional errors and omissions insurance. However, this was not the case in this instance. Under the Contract, the FRA clearly and unambiguously agreed to indemnify Parsons under P.L. 85-804 pursuant to authority granted FRA in the fiscal year 1979 DOT Appropriations Act.

The Contract provided the FRA would hold Parsons harmless from:

> (i) claims (including reasonable expenses of litigation or settlement) by third persons (including employees of the A-E Contractor) for death, personal injury, or loss of, damage to, or loss of use of property;
>
> . . .
>
> (c) ... in excess of the first $1,000,000 in the aggregate of all such claims, loss, or damage, which aggregate amount of claims, loss, or damage shall be borne by the A-E Contractor. Any such claim, loss or damage within deductible amounts of A-E Contractor's insurance required to be maintained pursuant to this contract shall not be covered under this clause.

The Contract also provided that all risks related to the NECIP are defined to be "unusually hazardous or nuclear in nature." Exhibit 4, Contract, Article XIV, ¶14.06. Under P.L. 85-804 this provision is tied to unusually hazardous activities thus triggering the provision of FAR Part

50. The indemnification was included in the Contract in consideration for the fact that Parsons was not required to maintain professional errors and omissions insurance coverage for the NECIP. These provisions were designed to protect Parsons from claims that would otherwise be covered by malpractice or errors and omissions insurance. *See* Exhibit 2.

**Description of Parson's Insurance Coverage (Item 9)**

Though Parsons was not required to carry professional errors and omissions insurance they were required to have comprehensive general liability insurance. Under a general liability insurance policy, the insurer is obligated to pay the legal costs of a business in a covered liability claim or lawsuit. Covered liability claims include bodily injury, property damage, personal injury and advertising injury (damage from slander or false advertising), but not damages caused by negligence or inadequacy in the performance of professional services. In comparison, professional errors and omissions insurance covers claims of alleged financial loss caused by negligence or inadequacy in the performance of these professional services. Such losses are not covered by a general liability policy, which typically covers only bodily injury and property damage losses not caused by negligent acts, errors or omissions, which are attributed to the performance of a professional service. Since the amounts sought in this REA would have been provided by professional errors and omissions insurance, which was not purchased at a savings to the government, and not general liability insurance, FRA under the terms of the Contract must reimburse Parsons for the damages sustained in the four projects discussed below.[1] For this reason, we do not have any applicable insurance information to provide you in response to your letter dated April 13, 2006, Item 9.

**Parsons Fully Complies with the Requirements of the Contract (Item 3)**

Parsons has complied with all requirements necessary to obtain an equitable adjustment of the Contract. Initially, we note that the FRA agreed to include an indemnification clause under Public Law 85-804. *See* Memorandum of Negotiation dated May 10, 1979 (under which FRA agreed to include such a provision in Letter Contract DOT-FR-76048.) Exhibit 2. Further, Parsons has complied with the applicable provisions of Article XIV of the Contract.

Parsons seeks equitable adjustments for judgments, settlements and expenses incurred for claims of third parties arising out of risks defined in the Contract to be unusually hazardous, not compensated by insurance and are in excess of $1,000,000 in the aggregate of all such claims, loss or damages as provided by Article XIV, § 14.01 of the Contract and are not excluded under

[1] In fact, FRA in its January 3, 2007, letter indicated that the indemnification clause "is already in effect" confirming that the claims contained herein are covered under P.L. 85-804.

§ 14.02. Further, § 14.08 provides that all risks resulting from Parsons' work under the Contract, except those covered by specified insurance policies, none of which applies here, are covered by the indemnification provision.

Moreover, Parsons has complied with the provision of § 14.06 and the Insurance-Liability to Third Persons Clause by promptly notifying the Contracting Officer of all claims for which indemnification is sought under this request and providing FRA with all pertinent papers relating to all claims, thus providing the Government with the opportunity to avail itself of the right to control or assist in the defense or settlement of all such claims. In furtherance of its contractual obligations, it was Parsons' practice to notify the Contracting Officer/Government in writing of all such claims. Due to the time period covered by these claims, all such correspondence is not presently available, either to Parsons or the FRA. Evidence of such notice, however, is included herein in the discussion of each sub claim including contemporaneous letters to the Contracting Officer or the FRA Legal Department, indicating such notice had been made. The notice provided by Parsons is sufficient under the circumstances.

The notice requirement applicable to a claim for indemnification under the Contract is addressed under Article XIV, § 14.06 and the Insurance-Liability to Third Persons Clause of the Contract. Article XIV, § 14.06 provided:

> The A-E Contractor shall –
> promptly notify the Contracting Officer of any claim or action against, or any loss by, the A-E Contractor or any subcontractor which reasonably may be expected to involve indemnification under this Article . . . .

Further, the Insurance-Liability to Third Persons Clause, the requirements of which was incorporated into § 14.06, provided that Parsons shall:

> [g]ive the Government or its representatives immediate notice of any suit or action files, or prompt notice of any claim made, against the Contractor arising out of the performance of this contract, the cost and expense of which may be reimbursable to the Contractor under the provisions of this contract, and the risk of which is then uninsured or in which the amount claimed exceeds the amount of coverage, The Contractor shall furnish immediately to the Government copies of all pertinent papers received by the Contractor...

It is clear from the plain language of the Contract there is no requirement that the notification be written. Thus, oral notification to the Contracting Officer of a claim or action is sufficient to

satisfy the notice requirement in the Contract. The reason is obvious, the government must be provided with the opportunity to take charge of the prosecution of a claim if, based on the facts presented, it believes it is in the government's interest to do so. Specifically, the ASBCA, interpreting a notice clause that required written notice – the Notification of Changes[2] clause found in FAR 52.243-7 – explained that:

> The Government can be placed upon notice of a claim by being made "aware of the operative facts" thereof. *E.g.*, *Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760, 768 (Ct Cl. 1972); *CM. Lowther, Jr.*, ASBCA No. 38407, 91-3 BCA ¶ 24,296 at 121,405. Where responsible Government officials are aware or should be aware of the facts giving rise to a claim, strict compliance with a contract's written notice requirements is not required. *E.g.*, *Central Mechanical Constr.*, ASBCA Nos. 29431, *et al.*, 85-2 BCA ¶ 18,061 at 90,657; *Davis Decorating Service*, ASBCA No. 17342, 73-2 BCA ¶ 10,107 at 47,475. Oral notice, as given . . . here, may be furnished to responsible Government representatives. *See Central Mechanical Constr.*, ASBCA Nos. 29431, *et al.*, 85-2 BCA ¶ 18,061 at 90,659; *MM Sundt Constr. Co.*, ASBCA No. 17475, 74-1 BCA ¶ 10,627.

*Grumman Aerospace Corp.*, ASBCA Nos. 48,006 *et al.*, 03-1 BCA ¶ 32202 ("[W]ritten notice requirements should not be construed hypertechnically to deny legitimate contractor claims when the Government was otherwise aware of the operative facts.") (citing *Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760 (Ct. Cl. 1972)).

Moreover, the ASBCA has held that "the lack of either oral or written notice or actual or constructive knowledge of the contracting officer will not bar a . . . claim unless the Government is prejudiced by that lack of knowledge." *Leiden Corp.*, ASBCA No. 26136, 83-2 BCA ¶ 16612. Thus, the Government bears the burden of establishing that it was prejudiced by the absence of the required notice. *See Grumman Aerospace Corp.*, ASBCA Nos. 48,006 *et al.*, 03-1 BCA ¶ 32202 ("This burden cannot be satisfied simply by allegation, but must be supported by evidence in the record."). Further, when the Government has knowledge of the underlying facts giving rise to a claim, it is unlikely it will be prejudiced in its investigation and defense thereof. *Id.* Accordingly, as discussed below, Parsons satisfied the notice requirement of the Contract for each claim it asserts.

[2] The Notification of Changes clause specifies that "the Contractor shall notify the Administrative Contracting Officer in writing promptly . . . ." FAR 52.243-7(b). It is important to note the fact that unlike FAR 52.243-7 the notice provisions of the Contract do not specify a written notification. Accordingly, FAR 52.243-7 involves a more stringent standard than is required under FAR 52.250-1(g)(1).

Further, Parsons has more recently provided FRA notice of these claims and its ability to assist or control in settlement or defense in its letters dated February 4, 2004, February 17, 2004, November 1, 2004, March 22, 2004, February 24, 2005, and May 5, 2005 attached hereto collectively as Exhibit 5.

## A. Gordon-Finger Claim

**Adjustment Requested (Item 4)**

Parsons provided architectural/engineering services in the 1980's for improvements at Amtrak's Wilmington, Delaware Rail Yard, including the design and construction of a building known as the Wheel Shop. During construction, excavated material, allegedly containing PCB contaminated soil, was removed from the rail yard and deposited on parcels owned by the Arthur J. Krieger (deceased) ("Krieger"), jointly by Bernard M. Gordon and Louis J. Finger ("Gordon-Finger Plaintiffs") and jointly by Krieger and Finger. On May 17, 1989, the Krieger and the Gordon-Finger Plaintiffs filed an action in the Chancery Court of the State of Delaware, C.A. No. 10753 against Parsons and others seeking damages and remediation of this alleged contamination. Exhibit 6.

Ultimately this case was tried on liability only. On April 2, 2002, Parsons and Amtrak were found liable. Exhibit 7. The docket entries outlining the complete history of this action thus far are attached as Exhibit 8.

Parsons therefore seeks, pursuant to the above referenced contract's indemnification clause, an adjustment in the amount of $190,000. As of the date of the Krieger settlement, Parsons attorney's fees and expenses totaled $425,082.42. Exhibit 9. Consequently, Parsons seeks a reimbursement of $615,082.42 for these claims.

Furthermore, at this time, the claims of Gordon-Finger Plaintiffs have not been resolved. Therefore, Parsons herby requests FRA's participation in ongoing settlement negotiations, which are discussed below.

**Parsons is Entitled to this REA in Regard to the Gordon – Finger Claim (Item 5)**

The Gordon-Finger litigation involves the types of claims that would be covered under malpractice insurance. As noted above, Parsons was not required to maintain professional errors and omissions insurance coverage since under Article XIV, § 14.06 of the Contract, Parsons was held harmless for claims arising from unusually hazardous activity. Exhibit 2. Further, FRA agreed that all of the work performed by Parsons under the Contract would be considered unusually hazardous. Consequently, the relief sought herein by Parsons is specifically authorized under the Contract.

**Parsons' Contractual Obligations, Final Payment and REA Proceeds (Item 6)**

Parsons' work under the Contract for improvement to the Wilmington Rail Yard is complete and final payment has been made. All of Parsons' obligations under the Contract have been discharged and none of the proceeds of this equitable adjustment are subject to any assignment, transfer, or insurance lien. Further, Parsons has not and does not intend to seek the same or similar relief from the Government Accountability Office or any other Governmental agency.

**Settlement Payments and Pending Claims (Item 7)**

While the claims of the Gordon-Finger Plaintiffs remain unresolved and are pending a hearing on the damages, Parsons entered into settlement discussion with the other plaintiffs. A settlement was reached on the other claims and on May 21, 2004, Parsons paid the Estate of Arthur Krieger $190,000 in settlement of its claims. A copy of that Settlement Agreement is attached as Exhibit 10.

**Litigation and Notice to FRA (Item 8)**

As noted above, the Gordon-Finger litigation steams from the excavating of material, allegedly containing PCB contaminated soil, from the Amtrak's Wilmington, Delaware Rail Yard and depositing of the soil on parcels owned by the Krieger, jointly by the Gordon-Finger Plaintiffs and jointly by Krieger and Finger. On May 17, 1989, the Krieger and the Gordon-Finger Plaintiffs filed an action in the Chancery Court of the State of Delaware, C.A. No. 10753 against Parsons and others seeking damages and remediation of this alleged contamination. Parsons, consistent with its customary practice, sent FRA notice of this claim.[3] Exhibit 11. Exhibit 11 is a letter dated May 12, 1989, sent by James C. Lockwood, who at the time was the Corporate Legal Counsel of Parsons, to George H. Seitz, III requesting that Mr. Seitz represent Parsons on the Gordon-Finger claim. This letter was sent at the commencement of this claim. Richard Krempasky, the Deputy Assistant Chief Counsel and Counsel for Procurement at the FRA, was sent a copy of this letter, which served as notice to FRA of the claim which could become the basis of a request for equitable adjustment under the indemnification provision of the Contract. As such the Contracting Officer, with regard to the Gordon-Finger claim, had actual or imputed knowledge of the facts giving rise to the claim. *Cf. Kumin Associates, Inc.*, LBCA No. 94-BCA-3, 98-2 BCA ¶ T 30,007 (1997) (The Board held that notice to an official with contract duties was sufficient to provide the requisite notice to the Contracting Officer, and that the Contracting Officer was not prejudiced by the lack of personal notice.) While Parsons, as noted above, does not have any documentation to support its claim that it furnished immediately to the Government copies of all pertinent papers relating to the claim, the fact it provided the initial

[3] Additional letters demonstrating FRA was on notice of this claim can be found at Exhibit 5.

filing provides evidence of Parsons' practice of supplying FRA with all pertinent information relating the Gordon-Finger claim. There is no indication that this practice ceased in this regard.

Ultimately this case was tried on liability only. On April 2, 2002, Parsons and Amtrak were found liable. Exhibit 7. The docket entries outlining the complete history of this action thus far are attached as Exhibit 8.

## B. <u>Wilbur Smith Associates Claims</u>

### Adjustment Requested (Item 4)

In the mid-1980s, Parsons provided, under the Contract, architectural/engineering services for the design and construction of the Stamford Transportation Center in Stamford, Connecticut. During construction numerous design defects were encountered and a subcontractor/architect, Wilbur Smith Associates ("WSA"), performed additional design work to address the structural weaknesses caused by the design defects. On October 27, 1986, WSA requested $1,210,845 from Parsons for the extra work on the structural elements of the Stamford Transportation Center. WSA submitted its claims to an arbitration panel which ruled against DCP in the amount of $377,636 plus interests and attorneys fees. Relevant documents from these proceedings outlining the history of this action are attached as Exhibit 12. Parsons seeks reimbursement in the amount of $377,636 for the WSA claim, plus the attorney fees, paid to the firm Gadsby & Hannah, P.A, in this matter which are discussed below. Exhibit 13.

### Parsons is Entitled to this REA in Regard to Wilbur Smith Associates Claims (Item 5)

The Wilbur Smith Associates litigation involved the types of claims that would be covered under malpractice insurance. As noted above, Parsons was not required to maintain professional errors and omissions insurance coverage since under Article XIV, § 14.06 of the Contract Parsons was held harmless for claims arising from unusually hazardous activity. Exhibit 2. Further, FRA agreed that all of the work performed by Parsons under the Contract would be considered unusually hazardous. Consequently, the relief sought herein by Parsons is specifically authorized under the Contract.

### Parsons' Contractual Obligations, Final Payment and REA Proceeds (Item 6)

Parsons' work under the Stamford Transportation Center Contract is complete and final payment has been made. All of Parsons' obligations under the Contract have been discharged and none of the proceeds of this equitable adjustment are subject to any assignment, transfer, or insurance lien. Further, Parsons has not and does not intend to seek the same or similar relief from the Government Accountability Office or any other Governmental agency.

**Settlement Payments and Pending Claims (Item 7)**

WSA submitted its claims to an arbitration panel which ruled against Parsons in the amount of $377,636 plus interests and attorneys fees. Parsons paid these sums to WSA. *See* Exhibit 12.

**Litigation and Notice to FRA (Item 8)**

As discussed above, the WSA claims arise from additional design work, which WSA performed, to address the structural weaknesses caused by the design defects. On October 27, 1986, WSA requested $1,210,845 from Parsons for the extra work on the structural elements of the Stamford Transportation Center. As noted above, WSA submitted its claims to an arbitration panel which ruled against DCP in the amount of $377,636 plus interests and attorneys fees. Relevant documents from these proceedings outlining the history of this action are attached as Exhibit 12. Like the Gordon-Finger claims the FRA also was on notice of the WSA Claims. Exhibit 14. Exhibit 14 is a letter dated August 1, 1988, sent by Mr. Lockwood to Mr. Krempasky.[4] This letter specifically memorializes that Parsons asked and received permission from the Contracting Officer prior to incurring outside legal fees as a contract expense in regard to litigating the Wilbur Smith Associate claims. Therefore, since, as noted above, Parsons was not required to provide written notice to the FRA Contracting Officer, this letter unambiguously evidences that the requisite notice to the Government was provided by Parsons. In fact, even if Parsons was required to provide written notice to the Government its August 1, 1988, letter provided this written notice. Further, as noted above, while Parsons does not have any documentation to support its claim that it furnished to the Government copies of all pertinent papers relating to the claim, Exhibit 14 demonstrates that Parsons did provide significant detail concerning the WSA claims both in writing and orally. Consequently, Exhibit 14 when coupled with the oral notice of these claims provided by Parsons to the Contracting Officer demonstrates Parsons' practice of providing FRA with all pertinent information relating the WSA claims. There is no indication that this practice ceased in this regard.

## C. A&C Fuel Claims

**Adjustment Requested (Item 4)**

On April 18, 1985, a vessel owned by the A&C Fuel Corporation ("A&C") collided with the Penn Mainline Bridge operated by Amtrak and designed by Parsons under the Contract. On October 31, 1986, A&C sued Amtrak to recover damages to its vessel in the collision. Exhibit 15. The docket entries outlining the complete history of this action are attached as Exhibit 16. A&C claimed that Parsons was aware of negligent design work of its subcontractor, Ammann &

[4] Additional letters demonstrating FRA was on notice of this claim can be found at Exhibit 5.

Whitney, on the temporary operating system and failed to act to correct this known defect, which was a contributing factor in the collision.

As addressed above, Parsons was represented by Gadsby & Hannah, P.A. for the WSA, and the firm also represented Parsons on the A&C claim. The firm billed Parsons for legal fees in the amount of $408,002.74 for services performed on these claims. Exhibit 17. The firm did not separately itemize service for these matters so Parsons is not able to itemize the legal fees. It is apparent, however, that most of these fees represent work on the WSA matter. Parsons seeks reimbursement in the amount of $20,833.33 for the A&C claim, plus the attorney fees, for both the A&C and WSA claims, in the amount of $408,002.74.

**Parsons is Entitled to this REA in Regard to the A& C Fuel Claims (Item 5)**

The A&C Fuel litigation involved the types of claims that would be covered under malpractice insurance. As noted above, Parsons was not required to maintain professional errors and omissions insurance coverage since under Article XIV, §14.06 of the Contract Parsons was held harmless for claims arising from unusually hazardous activity. Exhibit 2. Further, FRA agreed that all of the work performed by Parsons under the Contract would be considered unusually hazardous. Consequently, the relief sought herein by Parsons is specifically authorized under the Contract.

**Parsons' Contractual Obligations, Final Payment and REA Proceeds (Item 6)**

Parsons' work under the A&C related Contract is complete and final payment has been made. All of Parsons' obligations under the Contract have been discharged and none of the proceeds of this equitable assignment are subject to any assignment, transfer, or insurance lien. Further, Parsons has not and does not intend to seek the same or similar relief from the Government Accountability Office or any other Governmental agency.

**Settlement Payments and Pending Claims (Item 7)**

This action eventually settled, with Parsons making a payment of $20,833.33, Exhibit 18, and was dismissed on December 22, 1989. Exhibit 19.

**Litigation and Notice to FRA (Item 8)**

As addressed above, the A&C Fuel litigation arose from the collision of an A&C vessel with the Penn Mainline Bridge operated by Amtrak and designed by Parsons under the Contract. Exhibit 14. On October 31, 1986, A&C sued Amtrak to recover damages to its vessel in the collision. Exhibit 14. DCP was brought in to this action as a fourth party defendant. Exhibit 14. The docket entries outlining the complete history of this action are attached as Exhibit 15. As

was its customary practice, Parsons put FRA on notice of this claim. Exhibit 20. Exhibit 20 is a letter dated August 1, 1988, sent by Mr. Lockwood to Mr. Krempasky.[5] This letter specifically memorialized that Parsons asked and received permission from the Contracting Officer prior to incurring outside legal fees in litigating the A&C Fuel claims as a contract expense. Therefore, since, as noted above, Parsons was not required to provide written notice to the FRA Contracting Officer, this letter unambiguously evidences that the requisite notice to the Government was provided by Parsons. In fact, even if Parsons was required to provide written notice to the Government its August 1, 1988, letter provided this written notice. Further, as noted above, while Parsons does not have any documentation to support its claim that it furnished to the Government copies of all pertinent papers relating to the claim, Exhibit 20 demonstrates that Parsons did provide significant detail concerning the A&C Fuels claims both in writing and orally. Consequently, Exhibit 19 when coupled with the oral notice of these claims provided by Parsons to the Contracting Officer demonstrates Parsons' practice of providing FRA with all pertinent information relating the A& C Fuel claims. There is no indication that this practice ceased in this regard.

## D. Massachusetts Bay Transportation Authority Claims

**Adjustment Requested (Item 4)**

Under the Contract, Parsons also performed architectural engineering services for renovations and improvements to the South Station and associated structures, platforms, track and rail yards in Boston, Massachusetts ("South Station Project") in coordination with the Massachusetts Bay Transportation Authority ("MBTA"). On April 25, 1988, the MBTA sued Parsons in the Commonwealth of Massachusetts seeking damages resulting from delay claims brought by JF White Construction Company ("White"), the project's general contractor. The docket entries outlining the complete history of this case is attached as Exhibit 21.[6]

While Parsons is aware that it is FRA's position that the MBTA claims are barred by a reciprocal release, it disagrees with this position. Exhibit 24. As stated in our May 5, 2005, letter it is Parsons' position that this third party release does not relieve FRA from indemnification and the release is not reciprocal as it only runs to Parsons. Consequently, Parsons seeks reimbursement in the amount of $425,000 for the MBTA claim, plus the attorney fees, in the amount of $553,943.43.

---

[5] Additional letters demonstrating FRA was on notice of this claim can be found at Exhibit 5.

[6] The Complaint, First Amended Complaint and Second Amended Complaint outlining the claims asserted in this action are attached as Exhibit 22. The Memorandum of Decision and Order dated November 29, 1994, granted partial summary judgment to MBTA is attached is Exhibit 23.

**Parsons is Entitled to this REA in Regard to the Massachusetts Bay Transportation Authority Claims (Item 5)**

The Massachusetts Bay Transportation Authority litigation involved the types of claims that would be covered under malpractice insurance. As noted above, Parsons was not required to maintain professional errors and omissions insurance coverage since under Article XIV, § 14.06 of the Contract Parsons was held harmless for claims arising from unusually hazardous activity. Exhibit 2. Further, FRA agreed that all of the work performed by Parsons under the Contract would be considered unusually hazardous. Consequently, the relief sought herein by Parsons is specifically authorized under the Contract.

**Parsons' Contractual Obligations, Final Payment and REA Proceeds (Item 6)**

Parsons' work under the MBTA Contract is complete and final payment has been made. All of Parsons' obligations under the Contract have been discharged and none of the proceeds of this equitable assignment are subject to any assignment, transfer, or insurance lien. Further, Parsons has not and does not intend to seek the same or similar relief from the Government Accountability Office or any other Governmental agency.

**Settlement Payments and Pending Claims (Item 7)**

On or about March 15, 1995, Parsons made a payment of $425,000 to settle the MBTA claims, Exhibit 25, and Parsons paid attorneys fees and expenses in excess of $553,943.43 associated with the South Station project. Exhibit 26. Accordingly, Parsons' total losses for the MBTA claim were $978,943.43.

**Litigation and Notice to FRA (Item 8)**

On April 25, 1988, the MBTA sued DCP in the Commonwealth of Massachusetts seeking damages resulting from delay claims brought by White, the project's general contractor. The FRA also participated in the resolution of these claims. Exhibit 24. The docket entries outlining the complete history of this case are attached as Exhibit 21. As noted above the MBTA claim stems from delay claims. However, given the fact that FRA also participated in the resolution of these claims, Exhibit 25, it is clear that FRA was provided notice of the claims and was provided with all pertinent papers relating to the claims.[7] Nonetheless, based on FRA's participation, FRA has waived any argument that it did not receive proper notice of the Massachusetts Bay Transportation Authority claims.

[7] Additional letters demonstrating FRA was on notice of this claim can be found at Exhibit 5.

---

**E. Additional Request on Unresolved Gordon-Finger Claims**

Parsons herby provides further notice to FRA that once unresolved Gordon-Finger claims have been resolved, it will seek reimbursement of the attorney fees incurred in defending itself in this action as well as any damages paid to the Gordon-Finger Plaintiffs. As discussed above, the liability phase of this claim was tried before a Master of the Chancery Court in Delaware. The findings of the Master indicate that Parsons and Amtrak were liable in negligence. While damages have not yet been assessed in this case Parsons has entered into settlement negotiations with some of the plaintiffs.

At this time, this case is pending review by the Delaware Department of Natural Resources and Environmental Control ("DNREC"). Based upon DNREC's recommendations concerning the environmental status of the property, it is not clear that the parties will be able to settle the claims and, accordingly, the case may proceed to trial before a special Master. As was discussed in more detail in Parsons' February 4, 2004, letter, we are hopeful that a settlement could be reached in this case in the range of $200,000 to $300,000. However, considering the environmental liability in this matter, there is a possible exposure of $4 or $5 million dollars should the court order a complete cleanup of all of the property. In addition, Amtrak has spent a substantial sum of money in conducting a remedial investigation of the site and has cross claims pending against Parsons seeking to recover the amounts spent on the investigation which could exceed $200,000. As requested above, Parsons seeks FRA's participation in the ongoing settlement negotiations with the Gordon-Finger plaintiffs. Further, Parsons seeks an equitable adjustment for its attorney fees and costs incurred in this action since the Finger settlement in 2004, now totaling $30,845.66.

At this writing, Parsons' losses under the Contract, excluding those unresolved claims discussed above, now total $2,400,497.92. Under the deductible provision, Parsons is seeking a total reimbursement of $1,400,497.92 ($2,400,497.92 less deductible ($1,000,000)).

The documentation in Parsons' possession justifying this equitable adjustment is the Contract itself, attached as Exhibit 1, the Contract that FRA entered into with Parsons, including the Memorandum of Understanding dated May 31, 1979, attached as Exhibit 2 and the Contract Article XIV providing for Indemnification under Public Law 85-804, attached as Exhibit 4.

Parsons respectfully requests that the FRA grant this request for equitable adjustment. If you have any questions please do not hesitate to contact George H. Seitz, III, Counsel to Parsons.

Respectfully Submitted,

George H. Seitz, III
Attorney for Parsons Transportation Group, Inc.

GHS:drc
Enclosures
cc: Richard L. Reddy, Esquire (w/o encl.)(via facsimile)

U.S. Department
of Transportation
**Federal Railroad Administration**

1120 Vermont Ave., N.W.
Washington, D.C. 20590

APR 23 2007

APR 20 2007

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

George H. Seitz, III, Esq.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue–Suite 1500
Wilmington, DE 19899

Re: Parsons Transportation Group's Request for an Equitable Adjustment Under DCP-FRA Contract No. DOT-FR-76048 (October 26, 1976) (the "Contract")

Dear Mr. Seitz:

The following information concerns the above-referenced request for an equitable adjustment ("REA"), under the Contract, pursuant to FAR Part 50, filed by Parsons Transportation Group (Parsons) on March 20, 2007. Although the REA was filed after the February 28, 2007, deadline established by my letter of January 3, 2007, the request will be considered in the same manner as if the deadline had been met.

The REA has been carefully reviewed by this office in conjunction with our Office of Chief Counsel, and, for the reasons stated below, it is conditionally granted in part and denied in part.

The Claims

As stated in the instructions of April 13, 2006, the claims were supposed to be clearly divided into sub-claims, and then clearly aggregated into a grand total for all claims, in a sum certain. It took some measure of mathematical deduction to derive the constituent components of your claim. Nevertheless, we have determined that your claims may be summarized as follows.

| Claim | Amount |
|---|---|
| 1. Gordon-Finger/Krieger Claims | 615,082.42 |
| 2. Wilbur Smith and Associates Claims | 377,636.00 |
| 3. A&C Fuel Claim | 20,833.33 |
| 4. Attorney's Fees on 2. and 3. | 408,002.74 |
| 5. MBTA Claims (Claim and Attorney's Fees and Costs) | 978,943.43 |
| Gross Claim | 2,400,497.92 |
| Minus Deductible | 1,000,000.00 |
| TOTAL NET CLAIM | 1,400,497.92. |

Our analysis of the specific claims, and the conclusions for each, follows.

Gordon-Finger/Krieger Claims

These claims stem from problems with contaminated soils at Amtrak's Wilmington, Delaware, rail yard, and may be summarized as follows.

| Claim | | Amount |
|---|---|---|
| Settlement | | 190,000 * |
| Attorneys Fees and Expenses | 97,673.96 | |
| | 48,501.48 | |
| | 189,810.55 | |
| | 23,799.32 | |
| | 10,579.76 | |
| | 28,870.14 | |
| | 3,814.70 | |
| | 747.50 | |
| | 21,285.01 | |
| Subtotal | 425,082.42 | 425,082.42 |
| TOTAL CLAIM | | 615,082.42. |

*The request for an equitable adjustment is for a settlement of $190,000. But the supporting documentation in tabs 9 and 10 reflects a settlement amount of $195,000. No explanation is given for the difference in the amount claimed and the supporting documentation.

Correspondence concerning this claim in March 2004 clearly states FRA's position with respect to the quality of notice required under the indemnity provisions of the Contract. As stated in Mark Lindsey's letter to you of March 10, 2004:

> Section 14.06 requires DCP to promptly notify the contracting officer of any claim or action against DCP which might involve indemnification under the contract. There is no evidence that such notice was ever given to the FRA contracting officer. The sole letter DCP has produced relating to this litigation (addressed to DCP's outside counsel with a copy to an FRA employee not the contracting officer) is inconsistent with an intent to seek indemnification under this article in that it says nothing about indemnification and expresses an expectation that the suit will promptly be dismissed. The letter did not address or satisfy DCP's contractual obligations. FRA must have proper notification in order to defend itself against a claim or action in which indemnification is involved. DCP litigated and settled this lawsuit in state court over many years without the involvement or knowledge of this agency in derogation of FRA's contractual rights, and, therefore, FRA has no obligation under the contract to pay for it.

This is still an accurate statement of FRA's position.

---

Countering this position, Parsons now argues that the Contract does not require the notification to be written. FRA rejects this conclusion.

Section 14.06 requires that DCP ". . . furnish evidence of proof of any claim, loss or damage covered by this Article in the manner and form required by the Government, permit and authorize the Government to direct, control or assist in the settlement or defense of any such claim or action." It is difficult to imagine how DCP would comply with this provision orally. Evidence of such claim, loss or damage necessarily must be in writing.

Section 14.06 is aimed at providing the Government enough information at an early date to permit the Government to assess the merits of the claim for which the contractor seeks indemnification in time to direct or control the settlement or defense of the claim, or to assist in it, should the Government so choose. The Government's interests in defense of the claim are obviously fatally prejudiced if the Government does not receive the required "evidence of proof of any claim, loss or damage" until the claim has been litigated or settled. Had the Government received timely information, perhaps the Government could have found a witness with relevant information which would have assisted in the defense or an expert witness otherwise unavailable to the defense. Perhaps, upon learning the facts, the Government could have thought of a theory or an approach to the case which had eluded contractor's counsel. At any time, in order to perform such functions well, the Government needs both the plaintiffs' allegations and the facts in writing.

Even if FRA were to accept the supposition that notice could be oral, Parsons has presented absolutely no evidence (through affidavits or otherwise) that notice was orally given to the contracting officer on a timely basis to allow FRA to mount a defense to these claims or to participate in their defense.

The only evidence Parsons presents that FRA received any notice of this matter is a letter from DCP's in-house counsel to its outside counsel, a copy of which was sent to FRA's counsel (tab 11). The letter here presented describes the dispute as one primarily between plaintiffs and Amtrak. The letter recites that DCP's role had ended three years earlier and, even then, that DCP had little to do with the contested project. The letter expresses the expectation that the court will dismiss DCP from the lawsuit promptly. The letter does not inform the reader of the relevant facts of the case. The letter would reasonably lead FRA's counsel to conclude that this matter was of no concern to FRA and that no action needed to be taken. The letter is certainly not the notice contemplated by Article XIV of the Contract.

Parsons further cites additional written notification in 2004 and 2005 (tab 5), all of which involve the current claim for indemnification (now recast as the REA), and were written to FRA's attorneys, not its contracting officer. Most were written after the date on which DCP entered into

the settlement agreement. Such notice could hardly be considered to be useful to defending on-going litigation.

Documentation of attorney's fees and expenses consists only of invoice numbers, dates, and amounts. If an equitable adjustment were to be allowed, actual invoices would be required to be presented to verify that they would be allowable under the Contract.

For the reasons stated above, the REA with respect to these claims is denied.

Wilbur Smith and Associates Claims

These claims stem from allegations of design defects in connection with the Stamford Transportation Center in Stamford, Connecticut. Parsons seeks an equitable adjustment in the amount of $377,636 for the Wilbur Smith and Associates ("WSA") claims, being the amount awarded by the arbitrators in March 1989, and sought to be confirmed in the United States District Court for the District of Columbia in June 1989. Attorney's fees in connection with the WSA claims will be discussed in the next section. References are made to tabs 6, 7, and 8 in connection with the WSA claims; although, these tabs have nothing to do with this claim, and instead deal with problems with contaminated soils at the Wilmington, Delaware, rail yard, referenced in the Gordon-Finger/Krieger claims, above. The referenced award of arbitrators and the action in the United States District Court for the District of Columbia are found at tab 12.

The discussion in the Gordon-Finger/Krieger claims section, above, with respect to required notification to the contracting officer under section 14.06 of the Contract, also applies to the WSA claims, except that the referenced letter to outside counsel to DCP does not apply to these claims. No written notification was presented to the contracting officer which might have met the requirements of the Contract.

The amount sought by DCP of the WSA claims is not covered by Article XIV of the Contract (the indemnification clause) because WSA's claims were contract disputes under its subcontract with DCP and not claims "for death, personal injury, or loss of, or damage to, or loss of use of property . . . ," as required by Section 14.01 of the Contract.

It is probable that the arbitration award was recoverable as an allowable cost under Article III of the Contract. Section 3.03 of the contract envisions having the contracting officer requiring the contractor to correct design defects, errors, and deficiencies, and other design-related products and services (and to remedy by correction or replacement), and provides:

> . . . The cost of activities undertaken pursuant to this Section 3.03 shall be allowable costs, subject to the provisions set forth in Clause 27 entitled "Allowable Cost, Fixed Fee, and Payment" of the General Provisions of this contract, but no additional fee shall be paid with respect thereto.

If the arbitration award were an allowable cost, then attorney's fees for the arbitration would also be an allowable cost. The first letter you submitted as part of tab 14 asserts that the contracting officer had given permission to incur certain outside legal fees for the WSA arbitration, and the third letter you submitted as part of tab 14 recites that FRA was reimbursing DCP for the costs of the arbitration, thus it seems very likely that DCP was paid for the arbitration award and attorney's fees associated with it as a Contract cost. In any event, all such claims were conclusively determined when the Contract was closed out and final payment made.

Even if the WSA claims had not been conclusively determined when the Contract was closed out and did not fall within the ambit of Article XIV of the Contract, the REA with respect to the WSA claims would be barred by applicable statutes of limitation. The cause of action with respect to an indemnity is fixed upon the entry of a judgment against or payment by the indemnitee. The arbitrators made their award in this matter on March 4, 1989. (The application for confirmation filed by WSA with the United States District Court for the District of Columbia cites March 2, 1989, but the last arbitrator signed the award document on March 4, 1989 (tab 12).) Although the final judgment of the district court has not been presented by Parsons, it can be safely assumed from the documentation which has been presented that the judgment reflecting the award of arbitrators was made against DCP in mid-1989, and the amount which DCP would seek under the indemnity finally fixed at that time. Nevertheless, DCP did not formally take administrative action through its REA filing until 2007, almost 18 years later.

Parsons does not have an unlimited amount of time to file administrative action in the form of an REA to attempt to toll applicable statutes of limitations. Matters of simple equity, and statutes of limitation with respect to claims filed under the Contract Disputes Act, suggest that Parsons may not expect to collect on an indemnity if it does nothing for 18 years after the amount of a claim for which indemnification will be sought has been finally fixed. These claims are time-barred.

For the reasons stated above, the REA with respect to these claims is denied.

<u>A&C Fuel Claim</u>

This claim stems from allegations of improper bridge design by the owner of a vessel which collided with a bridge owned by Amtrak and designed by a subcontractor to DCP. The matter was settled in December 1989, with DCP making a payment of $20,833.33.

As stated in the discussion for the Wilbur Smith and Associates claims, above, DCP had an affirmative obligation to make written notification to the contracting officer under section 14.06 of the Contract. Parsons has not produced any timely notice to the contracting officer concerning this claim. Parsons has, however, submitted letters as part of tab 14 (the first and second letters) referring to actions of the contracting officer which must have been predicated upon notice of this claim. Solely for purposes of counting this claim from A&C Fuel against the $1 million deductible provided under Article XIV of the Contract, FRA is willing to accept the above-

referenced letters submitted as part of tab 14 as evidence that the contracting officer did have notice of this claim from A&C Fuel.

This correspondence is more extensive and much more specific than the letter submitted in connection with the Finger claim. In particular, where the letter at tab 11 expressed the belief that Finger's claim lacked merit and that DCP would be dismissed from the case (views which would not reasonably be expected to lead FRA's attorney to alert the contracting officer) and FRA's attorney merely received a copy of the letter addressed to someone else (not something to which FRA could reasonably be expected even to reply), the above-referenced letters at tab 14 directly involve FRA counsel, discuss the merits of the case, and expressly say that the contracting officer authorized DCP to incur fees for outside counsel as Contract costs. It does not appear that FRA counsel disagreed that the contracting office had authorized such expenditures, and, although the evidence is not conclusive at all, an inference can reasonably be drawn that FRA counsel was participating to the degree the agency desired in determining how the case should be handled.

The Secretary of Transportation and the contracting officer have not approved the assumption of liability involved in extending the indemnity to Amman & Whitney, as required under section 14.02 of the Contract.

For the reasons stated above, FRA is willing to conditionally allow $20,833.33 to be counted against the deductible provided under the indemnity in Article XIV of the Contract, if Parsons can present documentary evidence that the said amount was actually paid by DCP (and not by any other party) in settlement of this litigation, and the said amount was not compensated by insurance or otherwise, which condition is required by Section 14.01 of the Contract.

Attorney's Fees on the Wilbur Smith and Associates and A&C Fuel Claims

Parsons seeks an equitable adjustment in the amount of $408,002.74 for Gadsby & Hanna invoices in connection with the Wilbur Smith and Associates and A&C Fuel claims. A summary of this request is found at tab 17.

Parsons states that the law firm did not separately itemize services for these two cases and that Parsons is unable to itemize legal fees. Hence they are aggregated for both claims. It is hard to believe that DCP actually paid the invoices referred to in tab 17 if they do not detail legal work according to the cases involved and the work done. This calls into question whether the itemization of legal expenses for these claims (and, indeed, potentially for any other claims using a similar system) is sufficient in the back-up data to support the REA.

As stated above, documentation of attorney's fees and expenses consisting only of invoice numbers, dates, and amounts is insufficient to show that they would be allowable, allocable expenses under the Contract. If an equitable adjustment were to be allowed, actual invoices would be required to be presented to verify that they would be allowable under the Contract.

Such invoices must necessarily show how the work performed relates to the claims involved, which would include, at a minimum, separate billing for each attorney, the case the attorney was working on, the work the attorney was doing (e.g., writing a brief, settlement negotiations, or a trial), and the time spent broken down by reasonable increments, such as the customary 15 minutes used by most law firms.

The REA is not allowed with respect to attorney's fees relating to the Wilbur Smith and Associates claims for the same reasons as are stated above for those underlying claims, namely improper notice to the contracting officer, lack of coverage under the indemnity clause in the Contract, and applicable statutes of limitation, as set forth below.

Reasonable attorney's fees directly relating to the A&C Fuel claim would have been allowed to be counted against the deductible under Article XIV of the Contract if they could have been accurately described in sufficient detail, as set forth above.

DCP had an affirmative obligation to make written notification to the contracting officer under section 14.06 of the Contract, with respect to the Wilbur Smith and Associates claims, which was not done for those claims. Accordingly, there can be no action under the indemnity clause for an equitable adjustment with respect to attorney's fees for the Wilbur Smith and Associates claims.

Since reimbursement under the indemnity for the Wilbur Smith and Associates claims is barred by lack of coverage under Article XIV of the Contract, reimbursement under the indemnity clause for attorney's fees associated with those claims is similarly barred.

The discussion with respect to applicable statutes of limitation with respect to the underlying Wilbur Smith and Associates claims is also applicable to the REA with respect to attorney's fees for those claims. The matter was settled in 1989, and Parsons has waited almost 18 years to seek an administrative remedy on the indemnity. The statutes of limitation cannot be forestalled for such a period of time.

For the reasons stated above, the REA with respect to this claim is denied.

Massachusetts Bay Transportation Authority Claims

This claim stems from allegations of mis-design of Boston South Station, and may be summarized as follows.

| Claim | Amount |
|---|---|
| Settlement (DCP Payment) | 425,000.00 |
| Attorney's Fees and Costs | 553,943.43 |
| TOTAL CLAIM | 978,943.43. |

As has been stated in previous correspondence, including most recently in October 2005, DCP's ~~payment in connection with the Massachusetts Bay Transportation Authority claims was the~~ subject of reciprocal releases referenced in the 1995 settlement agreement disposing of the matter (tab 25). Under the terms of those releases, signed in April 1995, one of which was signed by DCP, and a copy of which has been previously provided, DCP may not make any claim against FRA with respect to the South Station project.

The essential part of the release is as follows:

> . . . [DCP] hereby releases and forever discharges the United States . . . of and from any and all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, whether currently known or unknown, that arise from or relate in any way to the design and construction, prior to the date of this Release, of renovations and improvements to the South Station . . . , <u>including, without limitation, matters that arise from or relate to claims or litigation brought against or involving the United States or any parties in connection with the South Station Project, including, without limitation, claims or litigation brought or involving the Massachusetts Bay Transportation Authority</u>. (Emphasis added.)

This release–and the companion releases by the other architect-engineers and the Federal Railroad Administration–was entered into in conjunction with the settlement agreement specifically because all of the parties–including DCP–were concerned about actions for contribution and/or indemnity which might follow settlement of the state court action. And the language of the releases reflects that specific concern. This language is not amenable to a construction which would permit an action for indemnity stemming from the MBTA litigation.

If DCP had intended to preserve its right to indemnification with respect to the MBTA litigation, it should have negotiated to have the indemnity specifically excluded from the broad release given in conjunction with the settlement agreement. The right of indemnity under the Contract predated the settlement agreement, and that right was clearly known by Parsons at the time. But, of course, that was the whole point of the reciprocal releases. All of the non-MBTA parties bargained for and believed they were obtaining a complete end to any liability whatsoever in connection with the MBTA litigation, with respect to each other, including all actions for contribution or indemnity. (MBTA refused to participate in any such release, and a Federal court case initiated in the late 1980s has only recently concluded.)

Of course, the REA is not allowed, in any event, for many of the same reasons as are stated above for the Wilbur Smith and Associates claims, and associated attorney's fees.

The MBTA claim is not covered by Article XIV of the Contract (the indemnification clause) because MBTA's claims were contract disputes stemming from claims brought by MBTA's

construction contractor for delay and other construction-related problems and not claims "for death, personal injury, or loss of, or damage to, or loss of use of property . . . ," as required by Section 14.01 of the Contract.

DCP had an affirmative obligation to make written notification to the contracting officer under section 14.06 of the Contract, which was not done in this case. Accordingly, there can be no action under the indemnity clause for an equitable adjustment.

The discussion with respect to applicable statutes of limitation with respect to the Wilbur Smith and Associates claims is also applicable to the REA with respect to this claim. This matter was settled in 1995, and Parsons has waited almost 12 years to seek administrative action on the indemnity. The statutes of limitation cannot be forestalled for such a period of time.

Attorney's fees with respect to this claim would have to be proven at a level of detail which is not evident in the REA.

For the reasons stated above, the REA with respect to this claim is denied.

Insurance Coverage

Item 9 of the instructions requested specific information (and copies) with respect to various kinds of insurance coverage, including specific types of coverage, such as general liability and workers' compensation, which may or may not be relevant under the indemnity provision of the Contract. It is clear that this request is modeled on the FAR provision with respect to the contents of a request for an equitable adjustment. It is also clear that the instructions are aimed at allowing the Government to make its own determination with respect to the relevance of various kinds insurance to the issues raised by the REA.

Parsons made its own determination that the information sought was not relevant to the issues raised by the REA and declined to provide the information requested. The "Description of Parson's Insurance Coverage" in the REA is argumentative and is completely non-responsive to the instructions. This response does not allow the Government to properly analyze the issues raised by the REA.

Conclusion

For the reasons stated above, FRA is conditionally granting an equitable adjustment under the Contract in the amount of $20,833.33, solely for the purpose of being counted against the $1,000,000.00 deductible under the indemnity provided for in Article XIV of the Contract, if Parsons can present documentary evidence that the said amount was actually paid by DCP (and not by any other party) in settlement of this litigation, and the said amount was not compensated by insurance or otherwise, which condition is required by Section 14.01 of the Contract.

All other requests for an equitable adjustment are denied.

Sincerely,

Illona M. Williams

Illona M. Williams
Director
Office of Acquisition and Grants Services

cc: S. Mark Lindsey, Chief Counsel
Gareth Roseau, Senior Attorney

SEITZ, VAN OGTROP & GREEN, P.A.
ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial: (302) 888-7602
Writer's E-Mail Address: gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

May 15, 2007

***Via Facsimile and***
***Regular Mail***
Gareth W. Rosenau, Esquire
Office of the Chief Counsel
1120 Vermont Avenue, N.W.
Washington, D.C. 20590

**RE: Parsons Transportation Group's Request for an Equitable Adjustment Under DCP-FRA Contract No DOT-FR-76048 (October 26, 1976) (the "Contract")**

Dear Gareth:

This will follow up our telephone conversation on May 7.

Thank you for taking the time to discuss the Federal Railroad Administration's ("FRA") position on this request for equitable adjustment. I wanted to clarify several points regarding your April 20, 2007, decision in determining how we may proceed from here.

Though you did not state that your April letter was a "final decision", we may consider it as such. The Contract Disputes Act specifically requires the FRA to state that the decision is final. There is, however, no similar provision under Public Law 85-804, so I understand that you decided not to include that language in this decision. However, based on our review of Federal Acquisition Regulation ("FAR") Part 50 we have a few additional questions; (1) was the April 20, 2007, decision letter that was provided to us that of the contracting officer or an authorized representative or that of FRA's approving authority; (2) if the decision letter was that of the contracting officer or an authorized representative has it been forwarded to FRA's approving authority for final decision, and (3) if the decision is the final decision of FRA's approving authority we request that you provide us with a point of contact for the Department of Transportation's Contract Adjustment Board so that we may request that it review FRA's decision.

Further, even though there was no specific section cited, I understand that it is FRA's position that the Contract Disputes Act's six year statute of limitations is applicable here. As I told you, it is our position that there is no statute of limitations for a Public Law 85-804 claim.

Nevertheless, this is an issue that will be resolved by FRA's approving authority or by the Department of Transportation's Contract Adjustment Board.

I look forward to your response. If you have any questions or need additional information please do not hesitate to contact me.

Thank you.

Very truly yours,

George H. Seitz, III

GHS :drc
Enclosure

cc: Richard L. Reddy, Esquire (via facsimile)

U.S. Department
of Transportation
**Federal Railroad Administration**

1120 Vermont Ave., N.W.
Washington, D.C. 20590

MAY 29 2007

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

George H. Seitz, III, Esq.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue–Suite 1500
Wilmington, DE 19899

Re: Parsons Transportation Group's Request for an Equitable Adjustment Under DCP-FRA Contract No. DOT-FR-76048 (October 26, 1976)

Dear Mr. Seitz:

The following information is in response to your letter of May 15, 2007, to Gareth Rosenau, concerning matters stemming from our April 20, 2007, decision in response to Parsons Transportation Group's request for an equitable adjustment under FAR Part 50.

As has been previously stated in our contracting officer's letter to you of April 13, 2006, your request for an equitable adjustment is properly filed under FAR Part 50, and is not cognizable as a claim under the Contract Disputes Act. See FAR 33.205(a). Therefore, the procedures provided for in the Contract Disputes Act with reference to final agency decisions on contract claims and appeals to agency boards of contract appeals (now amalgamated in the General Services Administration) do not apply to a request for an equitable adjustment filed under FAR Part 50. See 41 U.S.C. §§ 605–607 with respect to the process for appealing final agency decisions on contract claims to agency boards of contract appeals, which provisions clearly do not apply to an excluded request for an equitable adjustment under FAR Part 50.

Your appropriate remedy is to file an action directly with the United States Court of Federal Claims. See 28 U.S.C. §§ 1491 et seq. For such purposes, you may consider your request for an equitable adjustment and the agency's response to constitute an exhaustion of your administrative remedies concerning this matter.

As stated in our letter of April 20, 2007, it is FRA's position that many of Parsons' causes of action are time-barred by applicable statutes of limitation, in addition to other defenses.

Sincerely,

S. Mark Lindsey
Chief Counsel

cc: Gareth Rosenau
Illona Williams

JUN - 4 2007