IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PARSONS TRANSPORTATION GROUP, INC., | : | |
| Plaintiff, | : | |
| | : | No. 08-79C |
| v. | : | (Chief Judge Damich) |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE PLEADINGS UPON COUNTS I AND III**

George H. Seitz, III (DE0667)
Patricia P. McGonigle (DE3126)
SEITZ, VAN OGTROP & GREEN, P.A
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-0600
(302) 888-0606 fax
gseitz@svglaw.com
Attorneys for Plaintiff

Of Counsel:
Michael A. Hordell, Esquire
Heather Kilgore Weiner, Esquire
Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, District of Columbia 20005-2004
Telephone: (202) 220-1232

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

STATEMENT OF FACTS .......... 1

QUESTION PRESENTED .......... 5

ARGUMENT .......... 6

A. The Legal Standard .......... 6

B. The WSA and MBTA Losses Fall Squarely Within the Provisions of the Article XIV Indemnification Clause .......... 6

C. DCP is Entitled to Reformation of the Indemnification Clause .......... 11

CONCLUSION .......... 13

# TABLE OF AUTHORITIES

*Atamirzayeva v. U.S.*,
77 Fed. Cl. 378, 479-380 ....6

*Peterson v. U.S.*,
68 Fed. Cl. 773, 776....6

*Mostowy v. U.S.*,
24 Ct. Cl. 193, 197....6

*Branning v. U.S.*,
215 Ct. Cl. 949, 950....6

*E.I. DuPont De Nemours and Co., Inc. v. U.S.*,
54 Fed. Cl. 361, 367....6

*Cross Petroleum v. U.S.*,
51 Fed. Cl. 549, 554....6

*Lockheed Martin IR Imaging Sys., Inc. v. West*,
108 F.3d 319, 322 ....7

*E.I. DuPont De Nemours and Co., Inc. v. U.S.*,
365 F.3d 1367, 1372 ....7

*Potts v. Potts*,
790 A.2d 703, 713....10

*Strauss Veal Feeds Inc v. Mead and Hunt, Inc.*,
538 N.E.2d 299, 301 ....10

*Fall River Housing Auth. v. H.V. Collins Co.*,
604 N.E.2d 1310 ....10

*National Presto Industries, Inc., v. U.S.*,
338 F.2d 99, 107-109....12

*Sutcliffe Storage & Warehouse Co. v. U.S.*,
112 F.Supp. 590....12

*Jones & Sears, Inc. v. U.S.*,
158 Ct. Cl. 162, 172-173 (1962) ....12

*Bank of Guam v. U.S.*,
80 Fed. Cl. 739, 753....12

# I. STATEMENT OF FACTS

## A. The Contract

On or about October 26, 1976, the Federal Railroad Administration ("FRA") awarded Contract Number DOT-FR-76048 (the "Contract") to DeLeuw Cather/Parsons ("DCP") to provide services as prime architect-engineer and program manager for the Northeast Corridor Improvement Project ("NECIP"), a program undertaken by FRA pursuant to Title 7 of the Railroad Revitalization and Regulatory Reform Act of 1976. (DCP2, ¶7)[1] The NECIP was designed to make improvements to the rail facilities located on the Northeast Corridor served by the National Railroad Passenger Corporation ("Amtrak"). Id. at ¶8 The Contract originally contemplated that DCP would carry professional liability insurance to guard against any claims arising out of professional malpractice. Id.

On December 8, 1978, the FRA wrote to DCP discussing the items being negotiated by DCP and FRA as part of the definitization process. Issues being negotiated included the total amount of indemnification, whether *all* risks would be covered and the amount of the deductible, if any. (DCP159-161) DCP and the FRA agreed that all risks assumed by DCP under the Contract were covered by the indemnification clause, to the extent they exceeded $1,000,000 and were not otherwise covered by insurance. (DCP25-29)

However, as the definitization process moved forward, in a letter dated April 4, 1979, the FRA stated it would not pay for DCP's proposed malpractice insurance coverage. Instead, the FRA suggested providing the same protection to DCP through indemnification under Public Law 85-804. (DCP162-163) Subsequent negotiations led to a Memorandum of Negotiations dated May 31, 1979, pursuant to which the FRA agreed to indemnify DCP under P.L. 85-804 pursuant

---

[1] Parsons is filing a Joint Appendix in support of this brief and other related briefs filed concurrently herewith. References to the Appendix are designated as DCP___ followed by the page number(s).

to authority granted FRA in the fiscal year 1979 DOT Appropriations Act. (DCP32-33) The maximum liability of the Government under the indemnity was One Hundred million dollars ($100,000,000), but such amount was subject to increase if necessary. Id. As a result of this indemnification under P.L. 85-804, DCP was *not* required to maintain professional errors and omissions insurance coverage for the NECIP, but did retain comprehensive general liability insurance. Id.

As finally definitized on October 25, 1979, the indemnification provision provided the FRA would hold DCP harmless from:

> (i) claims (including reasonable expenses of litigation or settlement) by third persons (including employees of the A-E Contractor) for death, personal injury, or loss of, damage to, or loss of use of property;
>
> (ii) loss of or damage to property of the A-E Contractor, and loss of use of such property but excluding loss of profit...
>
> (iii) loss of, damage to, or loss of use of property of the Government but excluding loss of profit;
>
> to the extent that such a claim, loss or damage (A) arises out of or results from a risk defined in this contract to be unusually hazardous or nuclear in nature, (B) is not compensated by insurance or otherwise, and (C) is in excess of the first $1,000,000 in the aggregate of all such claims, loss, or damage, which aggregate amount of claims, loss, or damage shall be borne by the A-E Contractor. Any such claim, loss or damage within deductible amounts of A-E Contractor's insurance required to be maintained pursuant to this contract shall not be covered under this clause.

(DCP25)(emphasis added). Further, pursuant to §14.08 of the Contract, all of DCP's risks, except those covered by insurance, were defined as ultra-hazardous:

> Section 14.08
> For the purpose of this Article XIV, it is agreed that all risks, except the risks covered by the A-E Contractor's insurance policies covering automobile public liability, automobile physical damage (comprehensive and collision), workmen's compensation, and employer's liability, resulting from or in connection with the A-E

> Contractor's operations under this contract including, but not limited to services for systems engineering, program management, design, construction management, inspection and administration, and all related services for the Northeast Corridor Improvement Program as set out in and performed pursuant to this contract, as it may be changed from time to time in accordance with its terms, are usually hazardous risks whether or not the A-E Contractor's liability arises from the design, fabrication, or furnishing of products or services under this contract and regardless of whether the harm caused by such risk occurs before or after delivery to the Government of services equipment, or materials under this contract, or before or after the acceptance of contract performance by the Government, or within or without the United States.

DCP28 (emphasis added)

B. Review of the Claims

1. *Wilbur Smith Associates Claims*

In the mid-1980s, pursuant to the Contract, DCP provided architectural/engineering services for the design and construction of the Stamford Transportation Center in Stamford, Connecticut. DCP subcontracted this design to Wilbur Smith Associates ("WSA"). During construction, numerous design defects were encountered. WSA contended it was required to perform additional design work to address certain structural weaknesses caused by design defects. (DCP150-156) The FRA contended its costs were greatly increased by WSA design errors. WSA requested $1,210,845 from DCP for the extra work on the structural elements of the Stamford Transportation Center submitting its claims to an arbitration panel on October 27, 1986. Eventually, the panel awarded WSA only $377,636 of the amount it requested. DCP paid WSA $377,636 to satisfy the arbitration award. (DCP5-6)

While WSA pursued its arbitration claims, the FRA and DCP worked jointly to pursue claims against WSA for design errors. Eventually, the FRA determined it would be best to file a direct claim against WSA. (DCP158) The FRA sued WSA in Federal District Court in

Connecticut seeking damages for the losses caused by WSA errors and omissions.[2] (DCP164-208; Pleading Index, DCP231-248)

2. *A&C Fuel Corporation Claims*

On April 18, 1985, a vessel owned by the A&C Fuel Corporation ("A&C") collided with the Penn Mainline Bridge operated by Amtrak and designed by DCP under the Contract. On October 31, 1986, A&C sued Amtrak to recover damages to its vessel resulting from the collision. A&C claimed that DCP was aware of the negligent design work of its subcontractor, Ammann & Whitney, on the temporary operating system and failed to act to correct this known defect, which was a contributing factor in the collision. Parsons paid $20,833.33 to settle the A&C claim. (DCP5-6, ¶¶ 25-26, 54-61, 209-234)

3. *DCP Legal Fees*

Parsons was represented by the Gadsby & Hannah, P.A. law firm in both the WSA and A&C claim matters. The Gadsby firm billed Parsons DCP total legal fees in the amount of $408,002.74[3] for services performed on these claims. (DCP6, ¶¶ 27-29; DCP63) Parsons' losses from the WSA and A&C claim totaled $806,472.07 as of 1990.

---

[2] Discovery is ongoing in the present matter. Plaintiff is attempting to discover facts relating to the FRA/WSA district court action, and the WSA arbitration action, including whether the FRA agreed to indemnify DCP for losses sustained in connection therewith. Plaintiff is aware of DCP employee testimony, given in the WSA/FRA matters, that the FRA agreed to indemnify DCP under Article XIV of the Contract for all costs incurred in connection with the WSA arbitration. If true, then the FRA may be estopped from asserting a contrary position here. (NEC00375-00419) DCP has discovered WSA's counsel may have retained these records and is requesting same.

[3] The record does not presently reflect the amount of legal fees attributable to each case. Discovery is continuing and Parsons has obtained copies of the Gadsby billings and is attempting to assign the costs associated with each claim matter. Some depositions may be required for a complete reconciliation. Parsons believes that if the Court determines the legal fees fall under the indemnification deductible, such a breakdown is unnecessary.

4. *Massachusetts Bay Transportation Authority Claims*

Under the Contract, DCP also performed architectural and engineering services for renovations and improvements to the South Station and associated structures, platforms, track and rail yards in Boston, Massachusetts (the "South Station Project") in coordination with the Massachusetts Bay Transportation Authority ("MBTA"). On April 25, 1988, the MBTA sued Parsons in the Commonwealth of Massachusetts seeking damages resulting from delay claims brought by JF White Construction Company ("White"), the South Station Project's general contractor. (DCP7, ¶¶ 30-32; DCP 65-79)

On or after March 16, 1995, DCP made a payment of $425,000 to settle the claims asserted by White. (DCP65-79) In addition, DCP paid attorneys' fees and expenses in excess of $553,943.43 associated with the South Station Project claims. (DCP80) Thus, DCP's total losses for the MBTA claim were $978,943.43. Parsons seeks to include this amount as part of the deductible and to the extent it exceeds the deductible, seeks reimbursement from the FRA under the Article XIV indemnification clause of the Contract.

## II. QUESTION PRESENTED

Does an indemnification provision intended to include all claims that would have been covered by professional malpractice insurance bar recovery for sums paid (including settlement monies and related attorneys' fees and expenses) to resolve claims based upon alleged professional errors and omissions?

## III. ARGUMENT

### A. The Legal Standard

In evaluating the Government's motion for judgment of the pleadings, the Court is to "assume that all well-pled allegations in the complaint are true and indulge in all reasonable inferences in favor of …Plaintiff." *Atamirzayeva v. U.S.*, 77 Fed. Cl. 378, 479-380 (2007). "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Id quoting Peterson v. U.S.*, 68 Fed. Cl. 773, 776 (2005). This standard is "stringent". *Mostowy v. U.S.*, 24 Ct. Cl. 193, 197 (1991). A complaint "should only be dismissed…if it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle him to relief." *Id.* And, a motion for judgment on the pleadings "should be denied unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim." *Id quoting Branning v. U.S.*, 215 Ct. Cl. 949, 950 (1977). The Government has failed to meet its burden and the motion should be denied.

### B. The WSA and MBTA Losses Fall Squarely Within the Provisions of the Article XIV Indemnification Clause

The Government's position is simplistic – the indemnification clause set forth in Article XIV covers claims based in tort only. The claims for which DCP seeks indemnification are "contract-like" claims, thus, judgment on the pleadings is appropriate. The Government's over-simplistic approach ignores not only the language of Article XIV, but its intended purpose.

A contract is "inherently an allocation of risks between the contracting parties." *E.I. DuPont De Nemours and Co., Inc. v. U.S.*, 54 Fed. Cl. 361, 367 (2002) *rev'd on other grounds* 365 F.3d 1367 (Fed. Cir. 2004). Further, the general rules of contract interpretation are applicable to contracts to which the Government is a party. *Cross Petroleum v. U.S.*, 51 Fed. Cl.

549, 554 (2002) *citing Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997); *E.I. DuPont De Nemours and Co., Inc. v. U.S.*, 365 F.3d 1367, 1372 (Fed.Cir. 2004). Importantly, the "provisions of a contract must be read as part of an ***organic whole***, according to reasonable meaning to all of the contract terms, and assuring that no contract provision is made inconsistent, superfluous, or redundant." *Id. (emphasis added)* A review of the "organic whole" of the relevant Contract documents, together with the Article XIV indemnification clause, leads to but one conclusion – the indemnification clause was intended to be broad and cover *all risks* assumed by DCP that were not otherwise covered by other applicable insurance.[4]

There were several inherent risks in the Contract that DCP, as the architect and project manager, bore. These risks included the implied warranty to the construction contractors that its designs were adequate, complete, and constructible. DCP also bore the risk of any injuries caused by mistakes of its employees and independent contractors. Furthermore, as the project manager, DCP controlled site access, and was responsible for ensuring compliance with permitting, and other property use regulations and requirements, and, coordinating the activities of multiple subcontractors and contractors some of whom were its subcontractors, others selected by FRA, or a subcontractor of another contractor selected by FRA or DCP' subcontractors. (Contract, Scope of Services, Contract Exhibit 1, Tasks 403-407, DCP312-316) In a "typical" construction setting, the myriad of risks associated with such activities would be covered by

---

[4] *Accord, E.I. DuPont and Nemours Co., Inc., supra.* where in interpreting scope of indemnification clause and finding clause to encompass CERCLA liability claims raised years after contract's termination, court considered relevant contract documents, including provisions whereby government agreed to cover losses, expenses and damages not otherwise compensated by insurance and language of indemnification clause holding contractor harmless against "any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever…" *Id* at 1372. Similarly, here, the FRA agreed to indemnify DCP for all risks not covered by insurance, expressly requested DCP agree to indemnification under Public Law 85-804 in lieu of obtaining commercial malpractice insurance and agreed to broad indemnification language covering all "loss of property".

professional errors and omissions insurance. However, the FRA did not desire to proceed in the "typical" way. During the definitization process, the FRA made it clear – it did not want DCP to acquire professional malpractice insurance. Rather, under the Contract, the FRA clearly and unambiguously agreed to indemnify DCP under Public Law 85-804 pursuant to authority granted FRA in the fiscal year 1979 DOT Appropriations Act.

Furthermore, the Contract provided that ***all risks*** related to the NECIP were to be classified as "unusually hazardous or nuclear in nature" so as to trigger the provisions of FAR Part 50. (DCP21-29) Because liabilities under the Contract were potentially enormous, the FRA insisted that the indemnification provisions be included in the Contract. These provisions were designed to protect DCP from claims that would otherwise be covered by malpractice or errors and omissions insurance. (DCP31-32) It, in fact, was even broader, protecting DCP from ***all*** uninsured risks associated with its work in NECIP.

The WSA litigation involved the types of claims that would be covered under the indemnity clause. In essence, WSA sought reimbursement from Parsons for its work in redesigning the Stamford Station. (DCP150-155) Certainly this was a loss included within the purview of "all risks" DCP assumed under the NECIP contract.

Similarly, the MBTA litigation involved the types of claims that would be covered under professional malpractice insurance. As noted above, DCP was sued for its alleged errors and omission in the design of the South Station Project. DCP was not required to maintain professional errors and omissions insurance coverage since, under Article XIV, § 14.06 of the Contract, DCP was held harmless for claims arising from unusually hazardous activity. The FRA agreed that ***all*** of work performed by DCP under the Contract was unusually hazardous.

Consequently, the relief sought herein by Parsons relating to the WSA and MBTA claims is specifically authorized under the Contract.

The Government is seeking to limit the scope of the indemnification by attempting to take the word "property" out of context and ignoring the other relevant sections of the indemnification clause and the Contract as a whole. Without citing any authority to support its construction of the term "loss of property" as used in the indemnification clause, the Government asks this Court to interpret the term unreasonably restrictive to mean only tangible property. There is no support for so narrowly construing this language. If the parties had intended to limit the class of property covered, they could have chosen to narrow the term by saying "real property", "fungible property" or "tangible property". No such limiting language is used in the Article XIV indemnification clause.

The FRA knew that by entering into the NECIP contract, DCP was undertaking risks associated with the numerous services required to be performed thereunder. Those risks specifically included a risk that DCP could be sued by an owner, such as MBTA, who claimed that it sustained losses allegedly caused by DCP's errors and omissions. Similarly those risks also included the claim brought by WSA against DCP seeking additional costs incurred on redesigning the Stamford Station.

The claims asserted fall within the definition of "loss of property" in subparagraph (b) of the indemnification clause. The damages DCP was required to pay in settling MBTA and satisfying the WSA arbitration award, plus the litigation expense it incurred, represented a loss of its property (*e.g.* money) resulting from a risk assumed in entering the NECIP contract. To interpret the "loss of property" phrase in the indemnification clause as the Government suggests

would essentially make the clause meaningless in the context of the services DCP was providing under the NECIP Contract.

For this reason, Parsons believes the word "property" is used in the broadest sense and was intended to include losses covered under a professional malpractice policy. In such a context, "property" denotes "…everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes the real and personal property, easements, franchisees, and incorporeal hereditaments." *Potts v. Potts*, 790 A.2d 703, 713 (Md. App. 2002); *In re Smothers*, 3 B.R., 643 (ND Ohio 1980). Certainly, the damages and fees DCP was required to pay to the WSA and MBTA were the loss of its property as a result of the claims of third parties.

The indemnification provision was made to protect DCP from all risks associated with its work including all those that otherwise would be covered by professional liability insurance which would naturally include an errors and omissions provision. The intent of the parties controls interpretation of the contractual agreement as it allows for the rules of construction to give effect to the reasonable expectations of the parties. *Strauss Veal Feeds Inc v. Mead and Hunt, Inc.*, 538 N.E.2d 299, 301 (Ind.App. 1989). Indemnity provisions are to be construed fairly and reasonably to ascertain intent and effect purpose of same. *Fall River Housing Auth. v. H.V. Collins Co.*, 604 N.E.2d 1310 (1992). As such, the coverage of the indemnification provision should be construed as being consistent with what would be covered under professional liability insurance.

It is clear that "damages, fees, and expenses" would be covered under most errors and omissions policies. *Bruner and O'Connor on Construction Law* notes that, "[t]hese policies

usually define 'loss' quite broadly such as 'the monetary and compensatory portion of any judgment, award or settlement . . .' 4 *Bruner & O'Conner Construction Law* § 11:118.50 (Professional liability coverage: Introduction – Coverage for "negligent acts, errors or omissions"). Bruner says that "[t]he important points here is that the definition of 'loss' *does not exclude the damages recovered under a breach of contract action* unless those damages are pled in the form of the return of the compensation paid to the insured." *Id.* (emphasis added).

Therefore, since the intent of the parties in including the indemnification provision in the contract was to take the place of professional liability insurance covering errors and omissions, the provision should be construed as having done so effectively. And since under reasonable errors and omissions policies damages are recoverable, the term "property" in the indemnification provision should be interpreted as including "damages, fees, and expenses." The indemnification specifically provides it covers "...all such claims, loss or damage in excess of $1,000,000."

The government chooses to ignore the related language in the indemnification providing that all risks, other then those covered by insurance in connection with DCP's operations under the contract including "systems engineering, program management design, construction management, inspection and administration and all related services" for NECIP are covered under the indemnification clause." Article XIV. Unquestionably such services led to the liabilities imposed in the WSA and MBTA matters and fall under the indemnification.

C. <u>DCP is Entitled to Reformation of the Indemnification Clause</u>

This record amply demonstrates that the intent of the parties in entering into the Contract and specifically, Article XIV, was to provide DCP with indemnification which included the insurance coverage that would have been in place had DCP acquired professional malpractice

insurance. DCP contends if the Court determines the indemnification language is not broad enough to include the WSA, A&C and MBTA claims (and related litigation expenses claims), DCP should be permitted leave to amend its pleadings to seek reformation to conform the Contract language to the parties' intent. *See, National Presto Industries, Inc., v. U.S.*, 338 F.2d 99, 107-109 (Ct. Cl. 1964); *Sutcliffe Storage & Warehouse Co. v. U.S.*, 112 F.Supp. 590 (Ct. Cl. 1953); *Jones & Sears, Inc. v. U.S.*, 158 Ct. Cl. 162, 172-173 (1962).

Reformation of a written agreement on the grounds of mutual mistake is an appropriate remedy where (1) the parties to a contract were mistaken in the belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain, and (4) the contract did not put the risk of mistake on the party seeking reformation. *Bank of Guam v. U.S.*, 80 Fed. Cl. 739, 753 (2008). DCP should be permitted leave to amend its pleadings to assert a claim for reformation given the record evidence of the parties' intent as to the scope of Article XIV.

## IV. CONCLUSION

For the foregoing reasons and authorities cited herein, Parsons respectfully requests that the Court deny the Government's Motion for Judgment on the Pleadings Upon Count I and III.

SEITZ, VAN OGTROP & GREEN, P.A

/s/ *George H. Seitz III*

GEORGE H. SEITZ, III (DE0667)
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE 19899
(302) 888-0600
(302) 888-0606 fax
gseitz@svglaw.com
Attorneys for Plaintiff

Of Counsel:
Michael A. Hordell, Esquire
Heather Kilgore Weiner, Esquire
Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, District of Columbia 20005-2004
Telephone: (202) 220-1232

Dated: September 9, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2008, a copy of the foregoing *Plaintiff's Brief in Opposition to Defendant's Motion for Judgment Upon the Pleadings Upon Counts I and III* was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *George H. Seitz, III*

George H. Seitz, III

66684 v1