R. Parker

RECEIVED

JUN 20 1988

J. Lockwood
8th Fl.

AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

WILBUR SMITH ASSOCIATES, INC.

and

DE LEUW, CATHER/PARSONS

CASE NO. 16 110 00380 87B

PRELIMINARY STATEMENT OF DE LEUW, CATHER/PARSONS

On October 25, 1979, the Federal Railroad Administration ("FRA") awarded Contract No. DOT-FR-76048 to De Leuw, Cather/Parsons ("DCP"). DCP was to provide services as the prime Architect-Engineer, Program Manager for the Northeast Corridor Improvement Project ("NECIP"), a program undertaken by FRA pursuant to Title VII of the Railroad Revitalization and Regulatory Reform Act of 1976.

On July 21, 1980, DCP contracted with Wilbur Smith and Associates, Inc. ("WSA") to provide architectural-engineering services relating to the design and construction of the Stamford Transportation Center Project ("Project" or "Station") in Stamford, Connecticut.

Clause 2 of the General Provisions of the contract between DCP and WSA, entitled "RESPONSIBILITY OF ARCHITECT-ENGINEER," provided:

COPY FOR YOUR INFORMATION
from : M.J. LADINO
DATE: 6/14/88, 19 88

(a) The Architect-Engineer shall be responsible for the professional quality, technical accuracy and the coordination of all designs, drawings, specifications, and other services furnished by the Architect-Engineer under this contract. The Architect-Engineer shall, without additional compensation, correct or revise any errors or deficiencies in his design, specifications, and other services.

(b) Neither the Contractor's review, approval or acceptance of, nor payment for, any of the services required under this contract shall be construed to operate as a waiver of any rights under this contract or any cause of action arising out of the performance of this contract, and the Architect-Engineer shall be and remain liable to the Contractor in accordance with applicable law for all damages to DCP caused by the Architect-Engineer's negligent performance of any of the services furnished under this contract.

(c) The rights and remedies of the Contractor provided for under this contract are in addition to any other rights and remedies provided by law.

WSA submitted final designs for various portions of the Project to DCP over a period of time extending from late 1981 to early 1983. The final designs were given to FRA who in turn provided them to the City of Stamford, Connecticut ("City"). The City eventually awarded a construction contract to O&G Industries for construction of the Project. The final designs were relied upon by the construction contractor in formulating its bid. Construction began in March, 1983.

In October, 1984 the Stamford Building Inspector discovered serious structural deficiencies in the Station. He determined that there were design flaws in the floor beams of the concrete and steel concourse that crossed over the railroad tracks and in the roof of the new Station's underground lobby. Because city officials believed that the design flaws might lead to a collapse of part of the Project the City inspector, on November 20, 1984, terminated all construction on the Project until satisfactory solutions could be found to the structural inadequacies. At that time, the Project was approximately 85% complete.

Subsequent reviews of the Station design revealed that WSA failed to calculate properly either the dead and live loads, snow loads, wind loads or structural forces in each major component of the Station and garage. Sometime in late 1984 or early 1985 WSA, at its own expense, hired the engineering firm of Lev Zetlin to perform remedial design work. The City engaged the firm of Gannett Fleming as its independent design consultant to review the work done by Lev Zetlin and to provide technical assistance to the City during the necessary redesign.

Redesign work continued throughout 1985 and construction resumed on the Project in April, 1986. In January, 1987 the City building inspector formally accepted the remedial designs prepared by Lev Zetlin and authorized the resumption of both remedial and residual construction work.

## THE CLAIM OF WSA

On October 22, 1986, WSA submitted a claim to DCP in the amount of $1,210,845 for "extra work for each of the major structural elements at the Stamford Transportation Center." Through September, 1986 WSA claimed costs for the following elements:

| | |
|---|---|
| Pedestrian Bridge | $ 90,077 |
| Tunnel Lobby Roof | 145,509 |
| Tunnel Ext. (Stubs) | 93,335 |
| Parking Garage | 199,746 |
| South Tower | 42,216 |
| North Tower | 175,617 |
| Concourse | 419,379 |
| Subcontractor Negotiation | 32,005 |
| On-Site Observation | 9,961 |
| Total Claim: | $1,210,845[1] |

On October 5, 1987, WSA demanded arbitration and this proceeding ensued.

## ISSUES

1. Under the DCP/WSA Contract what were the design responsibilities of WSA?

2. Did WSA meet its design responsibilities as they relate to design of the Pedestrian Bridge, Tunnel Lobby, Tunnel Extensions, Parking Garage, South Tower, North Tower, Concourse, and other services?

---

1. Further cost breakdowns submitted by WSA can be found in Attachment 1.

3. Did WSA's failure to meet its design responsibilities result in extensive remedial design and corrective construction after October, 1984 and continuing to the present?

4. Do the costs and fees claimed in this arbitration and incurred by WSA in connection with the remedial design and construction work flow from WSA's failure to meet its original design responsibilities under the Contract?

5. Are the costs and fees incurred by WSA in connection with the remedial design and construction work compensable under the DCP/WSA Contract?

## DISCUSSION

The purpose of the Preliminary Conference is to arrange for an exchange of information, A Guide For Construction Industry Arbitrators, AAA-147-10M-11/85, pages 6-8. The factual information in the possession of WSA supporting the various claims in this arbitration must be submitted to DCP for inspection and/or copying. This information consists of correspondence, memoranda, designs, calculations, notes, minutes of meetings, and other documentary information in the possession of WSA compiled since July 21, 1980. DCP has not yet examined the information but cannot adequately prepare a defense to the WSA claims without it.

In addition, DCP presently knows of six individuals having direct and personal knowledge of the amounts claimed and the

work performed that supports the claims. They are: Hubbard, Whitlock, Lewis, Thornton, Narov and Bynum. It is expected that upon a full review of the documentation supporting the claims other individuals will become known to DCP.

In arranging for the exchange of information called out in the Guide, DCP would normally invoke the discovery rules of the Federal Rules of Civil Procedure. However, voluntary exchange of information by and between the parties is preferred. Alternatively, the parties could proceed pursuant to the District of Columbia Arbitration Statute, D.C. Code Section 16-4301 et seq. The Code authorizes arbitrators to cause subpoenas to be issued for the attendance of witnesses and for the production of books, records, documents and other evidence, D.C. Code Section 16-4307.

DCP represents to the Panel that it stands ready and willing to resolve the dispute and awaits the Panel's further instructions.

Respectfully submitted,

Michael J. Ladino
Counsel for De Leuw, Cather/Parsons

GADSBY & HANNAH
1747 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006
(202)429-9600

Dated: June 15, 1988

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration between | ) |
| WILBUR SMITH ASSOCIATES, INC. | ) |
| and | ) |
| DE LEUW, CATHER/PARSONS | ) |
| CASE NO. 16 110 00380 87B | ) |

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Preliminary Statement of De Leuw, Cather/Parsons upon the Tribunal Administrator by placing a copy of same in the United States mail, postage prepaid and properly addressed as follows:

Mr. Byrne Bennett
Tribunal Adminstrator
1730 Rhode Island Avenue, N.W., Suite 509
Washington, D.C. 20036-3169

This 15th day of June, 1988.

Michael J. Ladino
Counsel For De Leuw, Cather/Parsons

1st - Choice of Law
- DC Law
2nd - What does DC law say about 3rd party beneficiary?
- Direct use
- Intended beneficiary

U.S. Department of Transportation
Federal Railroad Administration

400 Seventh St., S.W.
Washington, D.C. 20590

MAY 6 1987

James C. Lockwood, Esq.
Deleuw Cather & Company
1133 15th Street, N.W.
Washington D.C., 20005-2701

Dear Jim:

Enclosed please find a Summary Litigation Report pertaining to claims against Wilbur Smith and Associates (WSA) I submitted to the Department of Justice on May 1, 1987. As you will note from the enclosed report, I have recommended that the United States enter direct suit against WSA in the event that settlement negotiations are unsuccessful. Naturally, I would request that this report remain confidential and that it not be released in any form to WSA or its counsel.

I would appreciate your comments on the litigation report. I anticipate discussing this matter with DOJ in the near future. I would expect to include you in those discussions.

Please note that this Litigation Report is preliminary to a formal request from DOT for DOJ to enter suit in its behalf. Assuming that the Commercial Litigation Division is amenable, I will process the formal request through DOT General Counsel as required by our internal procedures.

I have forwarded a copy of the litigation report to Mike Ladino by separate cover.

I look forward to your thoughts on the report.

Sincerely,

Dick

Richard W. Krempasky
Deputy Assistant Chief
Counsel for Procurement

Enclosure

DEPARTMENT OF TRANSPORTATION
FEDERAL RAILROAD ADMINISTRATION
WASHINGTON, D.C. 20590

DEC 8 1978

Mr. R. P. Howell
Project Director
DeLeuw, Cather/Parsons
1201 Connecticut Avenue, N.W.
Washington, D. C. 20036

Dear Mr. Howell:

In order for FRA to complete the process of indemnification of DCP under P.L. 85-804, the FRA-DCP Letter Contract must be modified to substitute P.L. 85-804 protection for the FRA protection that is presently provided. In your October 19, 1978 letter you have suggested an additional clause designed to accomplish this modification, however, your suggested language would also change the scope of indemnification to a significant degree by providing additional protection to DCP.

1. Financial Limit of Protection

Under the existing letter contract, the extent of Government liability is limited to an aggregate amount of $100 million. Your October 19 proposal, however, is without upper limit and would essentially have the Government hold DCP harmless for liability under the contract. FRA cannot agree to this unlimited P.L. 85-804 protection under the contract without adequate consideration to justify such a substantial change.

One possibility for providing the necessary consideration which would be acceptable to the Government, would be for DCP to bear the cost of a deductible of $1,000,000 per occurrence above which indemnification under P.L. 85-804 would be provided without limitation in amount. The costs incurred in the deductible would not be allowable costs under the contract.

2. Scope of Protection

The letter contract provides indemnification to DCP against liability for professional errors and omissions. Your October 19 letter suggests extending the indemnification to cover all DCP's risks under the contract except those for which DCP already has insurance and those specifically excluded from protection under P.L. 85-804. Counsel for DCP has explained to FRA that the intent of this proposal is to add product liability protection to the existing professional errors and omissions coverage. Nevertheless, this would be a significant change from the letter contract for which FRA must have adequate consideration.

It is possible that the liability assumed by DCP under the approaches suggested in section 1 above would be adequate consideration to allow FRA to accept this proposed change in scope of protection. This would depend on the specific proposal offered by DCP and an analysis of the value of the proposal to FRA.

Furthermore, in order to justify indemnification under P.L. 85-804, each risk against which the contractor is indemnified must be determined to be "unusually hazardous". A record has been made to support that the risks to DCP of professional errors and omissions on the NECIP are unusually hazardous, but no foundation exists for such a finding with respect to any other risks to which DCP may be subject. Your counsel has argued that the risks of DCP being held strictly liable for product liability for long-lead items that DCP procures for the NECIP are unusually hazardous. If you want any risks in addition to those attendant on professional errors and omissions indemnified against under P.L. 85-804, you must provide a factual foundation adequate to support a finding that those risks are unusually hazardous.

Outside of possible strict liability, we do not see a legal theory on which DCP might be held liable in tort in connection with the purchase of long-lead materials that is not covered by the present indemnity. We understand, however, that you have some concern that some of your employees who perform functions in connection with long-lead procurement may not be considered "professional" within the meaning of the indemnity. We will gladly discuss clarification of that with you.

3. Duration of Indemnification

The letter contract provides for Government protection until 15 years after completion or termination of the contract, whichever first occurs. Your October 19 proposal contains no limit to the duration of Government protection of DCP. We understand from discussions with counsel for DCP that your intent is to extend the duration of coverage so that the protection lasts as long as the statute of limitation for the State with the longest period of liability. Although we view this as a change from the letter contract that could increase the ultimate cost to the Government, we do not view this change (a five-year extension of coverage, as counsel explains it) by itself as a change requiring a great amount of consideration.

Conceivably, the consideration provided by DCP in return for an increase in the financial limit of protection and the increase in the scope of protection could be sufficient to justify FRA's acceptance of this proposed change in the duration of protection. Again, we would have to analyze a specific proposal from DCP before we could say whether or not the change is justified.

There are other changes contained in the October 19 letter but they are not as significant as the three discussed above. FRA and DCP should be able to negotiate acceptable language for modification of the contract for these minor issues without requiring additional consideration from DCP. As to the major changes discussed above, DCP should prepare a specific proposal indicating, in detail, the changes sought in the existing letter contract and the consideration you will be willing to provide the Government to justify those changes. For FRA to accept the changes you have suggested without consideration would be improper.

As it is in our mutual interest to resolve this matter expeditiously, we would like to meet with you as soon as possible to settle the extent of your coverage.

Sincerely,

Ray Rogers

Ray Rogers
Contracting Officer

DEPARTMENT OF TRANSPORTATION
FEDERAL RAILROAD ADMINISTRATION
WASHINGTON, D.C. 20590

APR 4 1979

received 4-6-79

Mr. R. P. Howell
Project Director
DeLeuw, Cather/Parsons
1201 Connecticut Avenue, N.W.
Washington, D. C. 20036

Dear Mr. Howell:

After reviewing the CNA proposal for a $5 million professional liability insurance policy and claims administration service for liabilities arising under the NECIP, it is our decision that FRA should not authorize DCP to purchase the proposed policy and claims service. This decision was reached after an analysis of the proposal, discussions with representatives of Victor O. Schinnerer, and conversations between counsel for FRA and DCP.

The fundamental problem with the proposal is its cost. DCP would receive $5 million in protection at a cost to the Government of $4.7 to $5.1 million depending on the level of deductible. The cost for claims service would be in addition to the cost for insurance protection. Because we anticipate P.L. 85-804 protection to be available to cover these same liabilities, it would not be appropriate to spend roughly $5 million in NECIP project funds for this protection.

Although FRA might be interested in purchasing a separate claims administration service to handle claims arising under the NECIP, we understand from subsequent conversations with Victor O. Schinnerer that the claims service proposal is integrally related to the insurance policy, and we do not have an opportunity to consider the claims service by itself.

There are other problems with the CNA proposal such as a provision allowing unilateral cancellation by CNA without cause that are unacceptable, but we understand from our discussions with Schinnerer that some of these provisions could be changed to meet our concerns. For example, CNA would agree to change the cancellation provision to allow cancellation by CNA only for failure to pay a premium. Even if these minor concerns would be negotiated to our satisfaction, however, the fundamental problems of cost and inseparatability of claims service would remain.

We appreciate the efforts of CNA, Schinnerer, and your broker to prepare this proposal and feel the exercise has been helpful to DOT in resolving the difficult problem of indemnification of DCP under the FRA-DCP contract.

Sincerely,

J. P. Sperty

Joseph P. Sperty
Director, Northeast Corridor
Procurement Division

Sept 4
Aug. 27

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | : | CIVIL ACTION NO. B-87-654 TFGD |
| v. | : | |
| WILBUR SMITH & ASSOCIATES, INC., Defendant. | : | OCTOBER 3, 1988 |

MOTION FOR SUMMARY JUDGMENT OF
WILBUR SMITH & ASSOCIATES, INC.

Pursuant to Rule 56, Fed. R. Civ. P., Wilbur Smith & Associates, Inc. hereby moves for Summary Judgment on the grounds that there are no material facts in dispute and it is entitled to judgment as a matter of law.

In support of this Motion, Wilbur Smith relies on the Statement of Material Facts, Affidavit of William J. Egan and supporting Memorandum, each of which is submitted herewith.

DEFENDANT
WILBUR SMITH & ASSOCIATES, INC.

By Carol A. Fantozzi

William J. Egan
Penny Q. Seaman
Carol A. Fantozzi
of Wiggin & Dana
195 Church Street
P.O.Box 1832
New Haven, CT 06508
(203) 789-1511
Its Attorneys

ORAL ARGUMENT REQUESTED
NO TESTIMONY REQUIRED

CERTIFICATION

This is to certify that on this 3rd day of October, 1988, a copy of the foregoing was mailed, postage prepaid, to Frank H. Santoro, Esq., Assistant United States Attorney, P.O. Box 1824 New Haven, CT 06508; and expressed mailed to J. Christopher Kohn, Esq. Robert M. Hollis, Esq. Torrence R. Thomas, Jr., Esq. Attorneys, Civil Division, Department of Justice, P.O. Box 875, Ben Franklin Station, Washington, DC 20044.

Carol C. Santoro

~~William J. Egan~~

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | : | CIVIL ACTION NO. B-87-654 TFGD |
| v. | : | |
| WILBUR SMITH & ASSOCIATES, INC., Defendant. | : | OCTOBER 3 , 1988 |

AFFIDAVIT OF WILLIAM J. EGAN

I, William J. Egan, hereby depose and state as follows:

1. I am over the age of eighteen and believe in the obligation of an oath.

2. I am counsel of record for Wilbur Smith & Associates, Inc. in this action and also represent Wilbur Smith in connection with an arbitration filed by Wilbur Smith against DeLeuw, Cather/Parson which is proceeding No. 16 110 00380 87B. A copy of the demand for arbitration is attached as Exhibit A.

3. Hearings in Arbitration number 16 110 00380 87B are scheduled to commence on October 31, 1988 (See Amended Notice of Hearing, July 20, 1988, attached as Ex. B).

Can't - No damage

4. DCP has not filed a counterclaim in the proceeding.

William J. Egan

STATE OF CONNECTICUT )
) ss: October 3, 1988
COUNT OF New Haven )

Personally appeared William J. Egan, signer and sealer of the foregoing instrument, and acknowledge the same to be his free act and deed before me.

~~Notary Public~~/Commissioner of the Superior Court

CERTIFICATION

This is to certify that on this 3rd day of October, 1988, a copy of the foregoing was mailed, postage prepaid, to Frank H. Santoro, Esq., Assistant United States Attorney, P.O. Box 1824 New Haven, CT 06508; and expressed mailed to J. Christopher Kohn, Esq. Robert M. Hollis, Esq. Torrence R. Thomas, Jr., Esq. Attorneys, Civil Division, Department of Justice, P.O. Box 875, Ben Franklin Station, Washington, DC 20044.

Carol A. Santoro

~~William J. Egan~~

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | : | CIVIL ACTION NO. B-87-654 TFGD |
| v. | : | |
| WILBUR SMITH & ASSOCIATES, INC., Defendant. | : | OCTOBER 3, 1988 |

STATEMENT OF MATERIAL FACTS
AS TO WHERE THERE IS
NO GENUINE ISSUE

Pursuant to Local Rule 9(c) Wilbur Smith and Associates, Inc. ("Wilbur Smith") submits that the following material facts are not in controversy.

1. The Stamford Transportation Center was part of the Northeast Corridor Improvement Project which the Federal Railroad Administration ("FRA") implemented pursuant to the Railroad Revitilization and Regulatory Reform Act of 1976. (Ex. 1)

2. On January 25, 1982, FRA entered into a Cooperative Agreement with the State of Connecticut (the "State")and the City of Stamford (the "City") pursuant to which FRA agreed to

provide one hundred percent of the funding for the construction of a railroad station at Stamford and fifty percent of the funding for the construction of a parking garage at the same site. The State and the City agreed to provide the balance of the funding. (Ex. 1 at Section 402 and p. 8).

3. The Cooperative Agreement further provided that the Project would be designed by FRA, owned by the State, and constructed, operated and maintained by the City. Id. at p. 10.

4. The Cooperative Agreement required FRA to furnish the City with final design documents which complied with applicable code requirements, adhered to sound architectural and engineering practices, and which were suitable for soliciting bids. Id. at p. 21-22.

5. The design documents were provided to FRA by DeLeuw Cathers/Parsons ("DCP") pursuant to a contract with FRA dated October 26, 1976. (Ex. 2)

6. These design documents were prepared by Wilbur Smith pursuant to a subcontract with DCP dated July 21, 1980. (Ex. 3)

7. On February 21, 1984 the City advised FRA of 54 items which the City claimed were "errors or omissions" in the design documents. (Ex. 5)

8. By letter dated July 13, 1984, FRA accepted 21 of the items raised by the City as "design errors or omissions." (Ex. 6)

9. On September 16, 1985, FRA, the City and the State entered into a supplemental agreement which provided as follows:

1) That the City assign its construction contract with O&G to FRA and FRA would provide the funds necessary to keep the Project moving;

2) That FRA furnish the construction phase management and engineering services at no cost to the City;

3) That FRA provide whatever remedial design work which was necessary but subject to the approval of Gannett Fleming;

4) That Gannett Fleming provide the independent advice required by the Building Official; and

5) That FRA reimburse the City for the fees it paid to Gannett Fleming.

(Ex. 12)

10. The contract between FRA and DCP expressly provided that FRA assumed the risk of errors or deficiencies in the design documents prepared by DCP's subcontractors and the subcontract between DCP and Wilbur Smith expressly provided that in the event of errors or deficiencies in the design documents, Wilbur Smith's only duty to FRA was to revise or correct the design documents. (Ex. 2, at Article 3; Ex. 3, at Clause 2)

15. FRA admits that Wilbur Smith fully performed this duty. (Deposition of Louis S. Thompson, May 17, 1988 at p. 73)

DEFENDANT
WILBUR SMITH & ASSOCIATES, INC.

By [signature]

William J. Egan
Penny Q. Seaman
Carol A. Fantozzi
of Wiggin & Dana
195 Church Street
P.O.Box 1832
New Haven, CT 06508
(203) 789-1511
Its Attorneys

CERTIFICATION

This is to certify that on this 3rd day of October, 1988, a copy of the foregoing was mailed, postage prepaid, to Frank H. Santoro, Esq., Assistant United States Attorney, P.O. Box 1824 New Haven, CT 06508; and expressed mailed to J. Christopher Kohn, Esq. Robert M. Hollis, Esq. Torrence R. Thomas, Jr., Esq. Attorneys, Civil Division, Department of Justice, P.O. Box 875, Ben Franklin Station, Washington, DC 20044.

~~William J. Egan~~

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>V.<br>WILBUR SMITH & ASSOCIATES, INC.,<br>Defendant. | CIVIL ACTION<br>NO. B-87-654 TFGD<br><br>OCTOBER 3, 1988 |

MEMORANDUM OF WILBUR SMITH
& ASSOCIATES, INC. IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

DEFENDANT
WILBUR SMITH & ASSOCIATES, INC.
William J. Egan
Penny Q. Seaman
Carol A. Fantozzi
of Wiggin & Dana
195 Church Street
P.O.Box 1832
New Haven, CT 06508
(203) 789-1511
Its Attorneys

TABLE OF CONTENTS


FORWARD . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. FACTS

- Cooperative Agreement . . . . . . . . . . . . . 1
- Design Contracts . . . . . . . . . . . . . . . . 2
- Construction Contracts . . . . . . . . . . . . . 3
- Design-Construction Conflict . . . . . . . . . . 3
- Supplemental Agreement . . . . . . . . . . . . . 6
- Redesign Phase . . . . . . . . . . . . . . . . . 10
- Resolution of Design Issues . . . . . . . . . . 11

II. CLAIMS OF PARTIES . . . . . . . . . . . . . . . . 13

- FRA . . . . . . . . . . . . . . . . . . . . . . 13
- Wilbur Smith . . . . . . . . . . . . . . . . . . 14

III. LIMITATION OF LIABILITY . . . . . . . . . . . . 15

1. NECIP . . . . . . . . . . . . . . . . . . . . 15
2. FRA-DCP Contract . . . . . . . . . . . . . . . 16
3. DCP-Wilbur Smith Subcontracts . . . . . . . . 23

IV. SECOND COUNT . . . . . . . . . . . . . . . . . . 26

V. FIRST COUNT . . . . . . . . . . . . . . . . . . . 30

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . 32

## FORWARD

Wilbur Smith & Associates, Inc. ("Wilbur Smith") submits this memorandum in support of its Motion for Summary Judgment on counts one and two of the complaint brought by the Federal Railroad Administration ("FRA") and dated September 28, 1987. The facts which support the motion appear in the contracts and documents authenticated during the course of discovery and the deposition testimony of officials of FRA. The relevant contracts, documents and testimony are contained in an appendix submitted simultaneously with this memorandum. As will more fully appear in the succeeding sections of this memorandum, the relevant material facts are not in dispute and demonstrate that Wilbur Smith is entitled to judgment as a matter of law on the first and second counts of the complaint.

## I

## FACTS

Cooperative Agreement

This case arises out of the design and construction of the Stamford Transportation Center (the "Project"). The Project was part of the Northeast Corridor Improvement Project ("NECIP") which FRA was authorized to implement pursuant to the Railroad Revitilization and Regulatory Reform Act of 1976 (45 U.S.C. §801 *et seq.*) and includes a railroad station, a parking garage for approximately 750 cars, and certain related

improvements. (Ex. 1 at pp. 1, 6) On January 25, 1982, FRA entered into a Cooperative Agreement with the State of Connecticut (the "State") and the City of Stamford (the "City") pursuant to which FRA agreed to provide one hundred percent of the funding for the railroad station and fifty percent of the funding for the parking garage. The State and the City agreed to provide the balance of the funding. (Ex. 1 at Section 402 and p. 8) The Cooperative Agreement further provided that the Project would be designed by FRA, owned by the State, and constructed, operated and maintained by the City. Id. at p. 10.

Design Contracts

FRA's design responsibilities were defined in Article II of the Cooperative Agreement which required FRA to furnish the City with final design documents which complied with applicable code requirements, adhered to sound architectural and engineering practices, and which were suitable for soliciting bids. Id. at P. 21-22. The design documents were provided to FRA by DeLeuw Cathers/Parsons ("DCP") pursuant to a contract with FRA dated October 26, 1976 (Ex. 2) and were prepared by Wilbur Smith pursuant to a subcontract with DCP dated July 21, 1980. (Ex. 3) FRA furnished the City with final design documents for the Project prior to December 1982. (Ex. 4)

Construction Contracts

Article III of the Cooperative Agreement required that the City construct the Project in accordance with the final design documents furnished by FRA and provided that the "City shall solely and exclusively administer construction contracts awarded under this Agreement". (Ex. 1, Section 305). In July 1982 the City entered into a contract with Sverdrup & Parcel ("S&P") under the terms of which S&P provided the construction phase management and engineering services for the Project. (Deposition of Paul C. Disario, June 30, 1988 ("Disario Depo.") at P. 17-18 and Ex. 3a.) On March 18, 1983 the City entered into a contract with O&G Industries Inc. ("O&G") under the terms of which O&G agreed to construct the Project in accordance with the design documents furnished by FRA for a lump sum price of $14,479,500. (Ex. 4) Neither FRA, DCP nor Wilbur Smith was involved in the administration of the construction phase of the Project.

Design-Construction Conflict

O&G commenced construction of the Project in March and April 1983. On any construction project there are a variety of changes that are inevitably made during the course of construction. Some changes are due to the owner's decision to better the project, and some may be due to design problems.

(Deposition of Louis S. Thompson, May 17, 1988 ("Thompson Depo.") at p. 29). There was an inherent conflict on the Project because the City was responsible for construction and FRA for design.

The focus of the conflict between the City and FRA in this case was a contingency fund equal to seven percent of the construction costs which FRA provided to the City to allow for all of the construction changes that would inevitably need to be made. (Thompson Depo. at p. 29) As Mr. Louis Thompson, Director of NECIP for the FRA testified:

> The City adopted a strategy of doing their very, very best, never to spend any of that seven percent contingency money . . . they thought if they never spent the seven percent money, that we would give it to them at the end of the project.
>
> * * *
>
> Consequently, Mr. Disario [of the City] adopted a strategy of calling every change he wanted made an "error and omission" rather than simply fixing it with the seven percent contingency money, which is what we told him it was for in the first place.
>
> (Thompson Depo. pp 29-30)

The City's strategy is reflected in a letter dated February 21, 1984 from Mr. Disario to Mr. Thompson. (Ex. 5) The FRA's frustration with the City's strategy is illustrated in Mr. Thompson's letters of March 20, 1984 (Ex. 6) and July 13,

1984. (Ex. 7) On February 21, 1984 the City advised FRA of 54 items which the City claimed were "errors or omissions" in the design documents. (Ex. 5) FRA's initial response in its letter of March 20, 1984 was to "deobligate" other federal funds previously committed to the Project.

> . . . a balance of $1,190,814.58 is left as unrequired Federal funds. Therefore, under the terms of the Agreement, FRA is hereby deobligating these funds. The $1,190,814.58 will not be available to the City for this project nor will any other additional funds be available unless specifically agreed to by FRA in writing.
>
> (Ex. 6)

As Mr. Thompson explained during his deposition:

> . . . we were, in effect, unilaterally resolving the argument with Mr. Desario by taking the money away. It was not well received, but we did it.
>
> (Thompson Depo. p. 30)

By July of 1984 the City's list of alleged errors and omissions had grown to 63 and FRA's patience had grown even thinner. By letter dated July 13, 1984, FRA stated that it would accept only 21 of the 63 items as "design errors or omissions," and directed the City to absorb the cost of these items, estimated to be $92,235, from the contingency fund. (Ex. 7, Thompson Depo. p. 39) FRA went on to reiterate the "deobligation" of funds announced in its letter of March 20, 1984 and chastised the City for making claims of error which were unfounded:

> . . . FRA has expended approximately $40,000 through inhouse staff time and consultants fees for the items which were not found to be the result of either errors or omissions. It is my opinion that this effort has contributed nothing to the benefit of the project. In the future, similar research will have to be attributed to administrative cost and deducted from the City's Letter of Credit accordingly.
>
> (Ex. 7, p. 3)

Although, Mr. Thompson thought he had terminated the debate with the City in July of 1984, such was not the case.

Supplemental Agreement

On November 20, 1984 the Building Official of the City of Stamford issued an order stopping work on the Project because of what he perceived to be "structural deficiencies" in the Project and directed that the Project be reviewed by an independent engineer. (Complaint, ¶13). After consultation with FRA and DCP, Wilbur Smith retained the engineering firm of Lev Zetlin Associates ("LZA") to conduct a review of the Project. The City chose to follow an independent course and retained the firm of Gannett Fleming Transportation Engineers Inc. ("Gannett Fleming"). (Deposition of Marcello H. Soto, June 17, 1988 at pp. 8-12.) Given the seriousness of the issues raised by the stop work order it did not take long for the already strained relationship between FRA and the City to erupt into open warfare.

The opening public salvo was fired by the City on March 4, 1985. On that date the City wrote the relevant members of Congress and in extremely intemperate language demanded a Congressional investigation of FRA's administration of the Project. (Ex. 8) By March of 1985, Mr. Thompson had:

> . . . reached the judgment that I was getting into what was known as a squirting match with a skunk.
>
> (Thompson Depo. p. 72)

Accordingly, his response to the City's letter of March 4, 1985 was remarkably restrained but designed to remove the City from the administration of the construction phase of the Project. On March 19, 1985, Mr. Thompson wrote the City as follows:

> The City of Stamford and the Federal Railroad Administration (FRA) now face a critical and immediate choice in determining how to proceed in addressing the design and construction problems that have arisen on the Stamford station project. As you know, the City and the FRA undertook separate but complementary responsibilities on the station project. FRA retained DeLeuw, Cather/Parsons (DCP) and Wilbur Smith and Associates, Inc. (WSA), both well-known, national Architect/Engineering firms, and took the responsibility for the design phase of the project. The City took responsibility for the construction phase. The City retained Sverdrup and Parcel, a well-known engineering firm, and the City awarded and supervised the construction contract with O&G Industries. Our roles are very much interdependent.

> This is why your letter of March 4, 1985 to Senator Danforth and Congressman Howard came as such a surprise to me. I left our January 24, 1985 meeting convinced that you understood that the station project has major deficiencies, that there is at least some fault by all parties, and that only a determined, cooperative effort by all concerned would get the job back on track.
>
> The FRA, DCP and WSA have made an all-out effort to proceed with the project, and we will continue to do so. I remain confident we can complete the station, but only with your help. The job will be much more difficult, and it will take a lot longer, if it has to be done in the face of your harsh and unnecessary criticism. Your current posture invites our two organizations to engage in a long, destructive contest of mutual finger-pointing if we choose to do so. But there is a more constructive course . . .
>
> (Ex. 8)

The "more constructive course" proposed by FRA included the following elements:

1) That the City assign its construction contract with O&G to FRA and FRA provide the funds necessary to keep the Project moving;

2) That FRA furnish the construction phase management and engineering services at no cost to the City;

3) That FRA provide whatever remedial design work which was necessary but subject to the approval of Gannett Fleming;

> 4) That Gannett Fleming provide the independent advice required by the Building Official; and
>
> 5) That FRA reimburse the City for the fees it paid to Gannett Fleming.
>
> (Ex. 8)

By letter dated March 21, 1985, the City communicated its acceptance of FRA's proposal. (Ex. 9) These agreements were formalized and expanded in a Supplemental Agreement dated September 16, 1985 by and among FRA, the State, and the City. (Ex. 10). In the Supplemental Agreement, FRA additionally agreed to reimburse the City for the "administrative costs" incurred by the City in negotiating and administrating the Agreement. Administrative costs were defined to include not only Gannett Fleming's costs but also the costs of the City's legal counsel and project manager. (Ex. 10, p. 47) On December 6, 1985 the construction contract between the City and O&G was formally assigned to FRA. (Thompson Depo. at p. 60-61.)

The reason that FRA entered into the Supplemental Agreement was because it believed:

> . . . that the management of the project was beyond the resources of the City of Stamford, either technical or financial or managerial . . .
>
> (Thompson Depo. p. 59)

Although the Supplemental Agreement gave FRA responsibility for the financial and managerial aspects of the Project, the Agreement required FRA to complete the Project in accordance

with redesign documents approved by the City and Gannett Fleming. (Ex. 10, Sections 101, 102 and 106) This put the City in control of the technical aspects of the Project and left FRA with the responsibility to both fund and manage the Project. Once the Supplemental Agreement was in place, FRA had little or no leverage to counter the City's strategy of bettering the Project at FRA's expense.

Redesign Phase

As admitted by FRA, work did not resume on the Project until April 1986, almost 18 months after the date of the Stop-Work-Order. (Complaint ¶20) Much of this 18 month period was consumed by debates over what was an error or deficiency, with the City and Gannett Fleming insisting that a particular item was a design deficiency and FRA, DCP, Wilbur Smith, and LZA insisting it was not. In those cases where FRA could not persuade Gannett Fleming that no error or deficiency existed, FRA directed Wilbur Smith to revise the design documents to satisfy Gannett Fleming. (See e.g. Deposition of Gregory Mester, June 16, 1988 at p. 67-71.) Wilbur Smith fully complied with these directives. As Mr. Thompson testified:

> Q. . . . Did FRA and DCP all agree that the best approach was a cooperative approach to get the project done?
>
> A. FRA, DCP and Wilbur Smith discussed that together, yes.

Q. And jointly did those three entities implement that cooperative approach?

A. Every step of the way as far as I can tell.

(Thompson Depo. p. 73)

Resolution of Design Issues

Although under the terms of the Supplemental Agreement FRA was required to prepare redesign documents subject to the approval of Gannett Fleming, the subcontract between DCP and Wilbur Smith imposed no such requirement on Wilbur Smith. After revising the design documents as directed by FRA, Wilbur Smith submitted a claim to DCP to recover the costs incurred in preparing the revised design documents. (Ex. 12) The basis of the claim was that the revisions were not made necessary by errors or deficiencies in the original design documents and therefore were changes within the meaning of Clause 35 of the subcontract for which Wilbur Smith was entitled to additional compensation. Id. The claim was submitted on August 27, 1986. (Ex. 12) On February 19, 1987 DCP sustained only a portion of Wilbur Smith's claim. (Ex. 13) In addition, DCP claimed that Wilbur Smith was liable for the costs now claimed by FRA in this action. (Compare Answer to Interrogatory No. 9 with Enclosure 1 to Ex. 13). Clause 5 of the contract between Wilbur Smith and DCP provides in relevant part:

> . . . any dispute arising under this contract which is not disposed of by agreement . . . shall be settled under the Construction Industry Arbitration Rules of the American Arbitration Association . . .

(Ex. 3, p. 21)

Wilbur Smith and DCP were not able to dispose of the dispute by agreement. On October 6, 1987, Wilbur Smith commenced an arbitration against DCP claiming the costs it incurred in revising the design documents. Affidavit of William J. Egan, October 3, 1988. ("Egan Affidavit") Hearings will commence on October 31, 1988. Id. FRA is reimbursing DCP for the costs it incurs in connection with the arbitration pursuant to the indemnity agreement in Section 14.01 of its contract with DCP. (Deposition of Robert Parker, June 24, 1988 ("Parker Depo.") at p. 60.) Although the subcontract provides for the arbitration of "any dispute arising under this contract" DCP has not asserted a counterclaim in the arbitration. (Egan Affidavit) As will appear in the following sections of this memorandum the only open issue between and among FRA, DCP and Wilbur Smith is whether Wilbur Smith is entitled to additional compensation for revising and correcting the design documents.

II

CLAIMS OF THE PARTIES

FRA

On September 28, 1987, FRA commenced this action against Wilbur Smith claiming that Wilbur Smith is liable to FRA for the costs it incurred pursuant to the Supplemental Agreement. (Complaint ¶¶ 17 and 18) The costs claimed by FRA total $11,283,087; the four major components of which are as follows:

| | | | |
|---|---|---|---|
| | 1. | $ 5,575,782 | To O&G for "Remedial" Work. |
| | 2. | $ 1,852,422 | To O&G for "delay" from November 1984 to April 1986. |
| | 3. | $1,756,998 | To DCP for construction phase management and engineering services. |
| | 4. | $ 1,866,599 | To the City for "administrative" expenses including legal fees. |
| TOTAL | | $11,051,801 | |

(Answer to Interrogatory No. 9 of Defendant's First Set of Interrogatories, March 21, 1988)

The premise of counts one and two of the complaint is that FRA is entitled to these costs because Wilbur Smith breached a duty which it owed to FRA to furnish design documents for the Project that were free of design defects. (Complaint ¶¶ 26 and 30) The first count sounds in negligence, and the second in contract.

WILBUR SMITH

Wilbur Smith does not dispute that it owed FRA a duty to furnish design documents that were free of design defects. Although Wilbur Smith had no direct contractual relationship with FRA, the subcontract between DCP and Wilbur Smith expressly provided that DCP was contracting under the authority of its contract with FRA, that the subcontract was for the benefit of FRA, and, indeed, that the design documents would become the property of FRA. (Ex. 3, Clauses 1, 63, and 7) However, the contract between FRA and DCP expressly provided that FRA assumed the risk of errors or deficiencies in the design documents prepared by DCP's subcontractors and the subcontract between DCP and Wilbur Smith expressly provided that in the event of errors or deficiencies in the design documents, Wilbur Smith's only duty was to revise or correct the design documents. (Ex. 2, Article 3, Section 3.03; Ex. 3, Clause 2) FRA admits that Wilbur Smith fully performed this duty. (Thompson Depo. at p. 73) It is for this reason that counts one and two of the complaint fail to state a claim upon which relief can be granted as will more fully appear in Section III of this memorandum.

(b) subj. to "all claims to DCP"

The second count of FRA's complaint is cast in terms of traditional third-party beneficiary law and when the subcontract is analyzed in those traditional terms the analysis provides additional clarification that Wilbur Smith fully

performed all its obligations to FRA under the terms of the subcontract. The second count is discussed in Section IV of this memorandum.

The first count of the complaint sounds in negligence and not only fails to state a claim upon which relief can be granted but states a claim which is barred by the applicable statute of limitations. The first count is discussed in Section V of this memorandum.

## III

## LIMITATION OF LIABILITY

### NECIP

Pursuant to the Railroad Revitilization and Reform Act of 1976 (45 U.S.C. §80 et seq) Congress delegated to FRA the responsibility for implementing NECIP. The stated purpose of NECIP was to improve facilities used for or related to intercity rail passenger service between Boston, Massachusetts and Washington, D.C. The Congressional mandate was in terms of goals and the responsibility for defining the particular facilities to be improved was delegated to FRA subject to the Congressional funding limit of $2,313,000,000. 45 U.S.C. §§851-854.

FRA-DCP Contract

On October 26, 1976, FRA entered into a contract with DCP under the terms of which DCP agreed to provide the technical expertise needed to implement NECIP and to serve as prime architect-engineer and project manager for NECIP. (Complaint ¶ 5; Ex. 2) The contract was a cost-plus-fixed fee contract pursuant to which FRA agreed to reimburse DCP for the costs DCP incurred up to $519,829,808 plus a fixed fee of $14,857,970 for a total maximum obligation of $534,687,778. The fixed fee was only three percent of the costs. (Ex. 2, Article VIII, Modification No. 104).

Cost reimbursement type contracts were first authorized by Congress on July 2, 1940 (Public Act No. 703 54 Stat. 712) and shortly thereafter the Comptroller General described the risks assumed by the Government under such a contract as follows:

> Reading these provisions together shows that the contract basically contemplates that the actual cost of the whole work and the risk thereof are to be assumed by the Government; that is, that the contractor is to come out whole, regardless of contingencies, in performing the work in accordance with the contract and the directions and instructions of the contracting officer, plus only a limited fixed fee as compensation for services, general overhead, use of the contractor's own or borrowed money, and profit.
>
> 20 Comp. Gen. 632, 637 (1941)

In the case of General Dynamics Corporation v. United States, 671 F.2d 474 (Ct. Cl. 1982) the Court of Claims described the basic nature of a cost-reimbursement contract as follows:

> This type of contract is viewed as a best-efforts agreement. Unlike a fixed-price contract, under which the contractor is obligated to deliver the material or service for the stated price, a cost-reimbursement contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price.
>
> If, despite its best efforts, the contractor cannot meet the contractual requirements, the government has obtained precisely what it bargained for, namely, the contractor's best efforts. The contractor therefore is entitled to receive or retain its costs for what it has done. The government's only right is to the product or services, plans, and equipment for which the contractor was or will be paid under the contract.

671 F.2d at 480-481

(Emphasis added)

The clauses which make a cost-reimbursement contract a best efforts agreement are the "Limitation of Funds" clause and the "Termination" clause, Clauses 60 and 4 respectively in the contract between FRA and DCP. Clause 60(d) provides in relevant part:

> . . . the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the total amount from time to time allotted to the contract, and the Contractor

> shall not be obligated to continue performance under the contract (including actions under the Termination clause) or otherwise to incur costs in excess of the amount allotted to the contract.

Clause 4(e)(1)(i) provides that if the contract is terminated, either for the convenience of FRA or because of the default of DCP, DCP shall be paid:

> . . . all costs and expenses reimbursable in accordance with this contract, not previously paid to the Contractor for the performance of this contract prior to the effective date of the Notice of Termination, and such of these costs as may continue for a reasonable time thereafter with the approval of or as directed by the Contracting Officer: Provided, however, That the Contractor shall proceed as rapidly as practicable to discontinue such costs.

The services that DCP was required to provide in its capacity as prime architect-engineer for NECIP were defined in Article II, Section 2.02 entitled "Scope of Services" as follows:

> [DCP] will be responsible through his in-house personnel, associate subcontractors, and subcontractors for all activities associated with producing the required construction documents to build the facilities required to implement the goals of [NECIP].

(Emphasis added)

Pursuant to Article III, Section 3.03 of the Contract entitled "Errors or Deficiencies" FRA agreed to reimburse DCP for the costs incurred by DCP in correcting or revising the design documents because of errors or deficiencies and to reimburse DCP for the costs incurred by DCP in correcting or replacing any defects in construction caused by errors or deficiencies in the design documents:

> At any time during the performance of this contract . . . the Contracting Officer may require [DCP] to correct or revise any design, drawing, specification, or other design-related product or any services performed under this contract to remedy any errors or deficiencies therein, or to remedy by correction or replacement, as directed by the Contracting Officer, any failure or deficiency of such subsystem which is due to an inadequacy or inadequacies of any one or any combination of designs, drawings, specifications, or other design-related products or any services performed, produced or provided by [DCP] under this contract, or both. The cost of activities undertaken pursuant to this Section 3.03 shall be allowable costs . . .
>
> (Emphasis added)

(Ex. 2, Article III, Section 3.03)

Not only did FRA agree to pay for correcting errors or deficiencies in the design documents and for correcting defects in construction caused by errors or deficiencies in the design documents, FRA agreed to hold harmless and indemnify DCP against claims by third parties arising out of errors or

deficiencies in the design documents. (Ex. 2, Article XIV, Section 14.01) The statutory predicate for such an agreement by a federal agency is a finding by the agency that the services being procured involve risks that are unusually hazardous. 50 U.S.C. 1431-1435. Thus, Section 14.08 of the contract between FRA and DCP provides:

> For the purpose of this Article XIV, it is agreed that all risks, except the risks covered by [DCP's] insurance policies covering automobile public liability, automobile physical damage (comprehensive and collision), workmen's compensation, and employer's liability, resulting from or in connection with [DCP's] operations under this contract including, but not limited to services for systems engineering, program management, design, construction management, inspection and administration, and all related services for the Northeast Corridor Improvement Program as set out in and performed pursuant to this contract, as it may be changed from time to time in accordance with its terms, are unusually hazardous risks whether or not the [DCP's] liability arise from the design, fabrication, or furnishing of products or services under this contract and regardless of whether the harm caused by such risk occurs before or after delivery to the Government of services, equipment, or materials under this contract, or before or after the acceptance of contract performance by the Government, or within or without the United States.

It is these clauses which form the basis for the Comptroller General's decision that under a cost-reimbursement type contract

> . . . the actual cost of the whole work and the risk thereof are to be assumed by the Government . . .
>
> 20 Comp. Gen. 632, 637 (1941)

It should be pointed out that although the government assumes the risks of performance under a cost-reimbursement type contract, the government does not assume the risk of the contractor's failure to use his best efforts to perform the contract. As the Comptroller General has explained.

> If knowingly or without appropriate investigation, the contractor employs a thief to carry the payroll or an inebriate to drive a truck or keeps on the job, a worker known to be careless, he takes the risk and must bear the consequences. On the other hand, even the most exacting care in the selection of a large force of workmen may afford no guarantee against negligent losses. Persons habitually careful may on occasion suffer lapses of attention or momentary indecision. Under stress of emotion or through overconfidence or temporary confusion in an unusual situation they may take chances or fall into conduct which may be branded as negligence when measured retrospectively against the legal standard of the conduct of the average prudent man under similar circumstances . . . But the contract contemplates that for faithful performance the contractor shall come out whole, plus the stipulated fee as compensation for his services, etc. It follows that while the Contractor may be reimbursed such losses as an element of his actual costs, where not otherwise excluded by the contract, he may not be so reimbursed in cases where he has failed to exercise reasonable care in the

> selection and employment of the individual workers involved, or where such persons have been retained after the contractor has reason to know that they are not trustworthy and careful.

21 Comp. Gen. 149 (1941)

The contract between FRA and DCP required that:

> Preliminary and final detailed design shall be accomplished by fixed price subcontracts supervised by [DCP].

(Ex. 2, p. 5)

All fixed price subcontracts in excess of $1,000,000 had to be approved by FRA and DCP's supervisory responsibilities were not left undefined; DCP was required to develop a comprehensive quality assurance program to guard against errors or deficiencies in the design documents prepared by its subcontractors and to review and approve the design documents before submitting them to FRA. (Ex. 2) Thus, if it did not use its best efforts in reviewing and approving those design documents DCP would not be entitled to reimbursement from FRA for the costs DCP incurred as a result of errors or deficiencies in the design documents. DCP was very careful to protect itself against this risk in its subcontracts. (Ex. 3, Clauses 2(b) and 2(c))

DCP-Wilbur Smith Subcontract

The subcontract between DCP and Wilbur Smith is dated July 21, 1980 and required Wilbur Smith to prepare the final design documents for the Project in accordance with applicable codes and accepted engineering practices for a fixed price of $1,315,502. (Ex. 3, Modification AC-80-199-16) The subcontract is on a standard form which is closely modeled after the standard government fixed-price architect-engineer contract and the individual clauses in the subcontract contain a cross reference to the standard government contract clause on which the subcontract clause is modeled.

Wilbur Smith's responsibilities to both FRA and DCP are defined in Clause 2 of the subcontract which recites that the clause is modeled on "SF 253, Rev. 4-75 modified." SF is defined to mean "standard form published by the U.S. Government, General Services Administration." (Ex. 3, Clause 1, (p)). The unmodified version of the standard "Responsibility of the Architect-Engineer" clause appears in what is now 48 C.F.R. §52. 236-23 and is as follows:

> (a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor under this contract. The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its designs, drawings, specifications, and other services.

> (b) Neither the Government's review, approval or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of this contract, and the Contractor shall be and remain liable to the Government in accordance with applicable law for all damages to the Government caused by the Contractor's negligent performance of any of the services furnished under this contract.
>
> (c) The rights and remedies of the Government provided for under this contract are in addition to any other rights and remedies provided by law.
>
> (Emphasis added)

The modified version of this clause which was used in the subcontract between DCP and Wilbur Smith was as follows:

> (a) The Architect-Engineer shall be responsible for the professional quality, technical accuracy and the coordination of all designs, drawings, specifications, and other services furnished by the Architect-Engineer under this contract. The Architect-Engineer shall, without additional compensation, correct or revise any errors or deficiencies in his design, specifications, and other services.
>
> (b) Neither the Contractor's review, approval or acceptance of, nor payment for, any of the services required under this contract shall be construed to operate as a waiver of any rights under this contract or any cause of action arising out of the performance of this contract, and the Architect-Engineer shall be and remain

> liable to the Contractor in accordance with applicable law for all damages to DCP caused by the Architect-Engineer's negligent performance of any of the services furnished under this contract.
>
> (c) The rights and remedies of the Contractor provided for under this contract are in addition to any other rights and remedies provided by law.
>
> (Emphasis added)
> (Ex. 3, Clause 2)

The standard government clause was modified to delete the government as the beneficiary of Clauses 2(b) and 2(c). If FRA wanted the same rights against Wilbur Smith under the subcontract that it would have against an architect-engineer under the standard government fixed price prime architect-engineer contract, it would not have deleted the word "Government" from the standard "Responsibility of Architect-Engineer" clause. If FRA wanted such rights, it would have been a simple matter to leave the word "Government" in the clause and to add the words "and Contractor" or the words "and DCP". Instead the word "Government" was deleted because the only obligation FRA wanted from Wilbur Smith that it did not already have from DCP, was the obligation to correct or revise the design documents at no cost to FRA..

Under the prime contract FRA contracted for the best efforts of DCP and its subcontractors and when DCP subcontracted with Wilbur Smith for the benefit of FRA, Wilbur